[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 322 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 323 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 324 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 325 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 327 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 328 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 330 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 331 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 332 
The bill contains distinct averments in relation to both the assignments to the state of Michigan of the debt against the Long Island Railroad Company — that they were made by the president and cashier of the Morris Canal and Banking Company, without the authority of the directors of that company. In regard to the first assignment, which bears date December 9th, 1840, the allegation is, that the agent of the state of Michigan prevailed upon the executive officers of the Morris Canal and Banking Company, *Page 333 
without the knowledge, assent, or approbation of a majority of the directors of that company, to agree to assign that debt, and that the said executive officers, that is to say, the president and cashier of that company, executed the assignment. And in a subsequent paragraph the plaintiff avers in his bill, that the president and cashier held possession of the assets and property described in the agreement, without any express or implied right to dispose of the same, or part with the possession thereof, without the assent of the Morris Canal and Banking Company, or the persons properly vested with the same — which assent was never given, or in any way obtained. In relation to the assignment of the second or additional mortgage, the allegation in the bill is, that said mortgage was, on the 26th day of April, 1841, assigned to the state of Michigan, by the said officers of the Morris Canal and Banking Company, as a further security for the debt due to the state of Michigan, without the authority of the directors thereof — although the said assignment fraudulently represents that the same was made in pursuance of a resolution of the board of directors of said company.
Laying out of the question everything in relation to the insolvency of the company when the assignments were made, they are represented by the bill to be the acts of the president and cashier, without the authority of the directors. This is admitted by the demurrer, and thus the naked question is presented to us, whether the president and cashier of the Morris Canal and Banking Company could, of their own will, and without the authority or consent of the board of directors, dispose of the property of the corporation.
The president and cashier, and other executive agents of a corporation, are sometimes permitted by the directors, without express authority, to do acts not within the sphere of their official duties or agencies, and are thus held out to the public as having authority to do such acts. In such case, the corporation will be bound by the acts of its agents, on the ground of implied authority. But upon the bill and demurrer in the *Page 334 
present case, all idea of implied authority is effectually excluded. The bill alleges that the president and cashier had no authority from the directors to execute the assignments, and the demurrer admits it, and unless the charter of the corpotion gave authority to the president and cashier to make the assignments, without the knowledge and assent of the directors, they were made without authority. I do not understand, from the opinion delivered in the superior court, that it was there supposed that these officers had power virtute officii, to execute the assignments in question, and it is very clear they had not.
The Charter of the Morris Canal and Banking Company is made part of the bill. By its third section, the management of the concerns of the company was vested in fifteen directors, to be selected from the stockholders, and the directors were to choose a president from among themselves. The 8th section gives to the president and directors, or a majority of them, the power to elect all engineers, treasurers, collectors, cashiers, toll-men, clerks, agents, c. necessary in their judgment for conducting the affairs of the company.
But the powers and duties of the president and cashier are not prescribed by the charter; no power is conferred upon them to mortgage, assign, or dispose of the property of the corporation. This is a part of the management of the concerns of the company which is confided expressly to the directors, but not to the president and cashier. In no case has it been held that these officers have the power to do an act like that in question, without the assent and authority of the directors. In Leggett
v. N.J. Manufacturing and Banking Company, (Sax. Ch. Rep. 542,) it was held that a mortgage of real estate, executed by them under the corporate seal, but without the authority or concurrence of the board of directors, was not a valid instrument. The management of the concerns of that company was committed, as in the present case, to a board of directors, and the powers of the president and cashier do not appear to have been defined by the charter. The value *Page 335 
of the property which the president and cashier undertook to assign to the state of Michigan, amounted to $40,000. The securities were not negotiable — and it was necessary that the transfer should be made under the common seal of the corporation.
In Massachusetts, it has been held, that neither the president nor the cashier of a bank has the power, in virtue of his office, to transfer the negotiable funds of the bank, without express authority from the directors. This, however, must be erroneous, if the transfer be made in the usual course of business, and in good faith. But it is safe to say, that when the sale, assignment or transfer of the property of the corporation requires the use of the common seal, it cannot be made without the assent and authority of the board. A great proportion of the failures and bankruptcies of corporations, and of the frauds committed by them upon those who have dealt with them, have resulted from the usurpation, by their executive officers, of the powers which by the charters are entrusted to the directors; and although in many cases the corporations have been held bound by such acts, this has been on the ground that these officers have been permitted by the directors to take the entire management into their own hands — and thus held out to the public as authorized agents for that purpose — or on the ground of subsequent ratification of the act, and that such ratification is equal to an original authority. Upon the pleadings in this case there is no room for implying an authority on either of these suppositions.
A deed formally executed under the corporate seal, bears upon its face the presumption that it was executed by competent authority from the corporation. But this presumption may be repelled, and the deed avoided, by showing that the seal was affixed without authority. The assignments in question to the state of Michigan, upon the facts shown, are not voidable merely; but absolutely void. They appear on their face to convey a title; but on the facts stated and admitted, they convey nothing; and without reference to the insolvency *Page 336 
of the corporation, their validity may be impeached by the corporation itself; or in connection with such insolvency, by its creditors, directly or collaterally, and with the same effect as if they had been forgeries; and whether the state of Michigan was a bona fide purchaser of the debt and securities or not, makes no difference. The assignments not being the acts of the corporation, the state acquired no title. The case stands on the same footing as if the assignments had never been made. Thompson acquired nothing from Michigan, because the latter had nothing to give. The Morris Canal and Banking Company remained the owners of the debt in question.
The next inquiry will be, whether the plaintiff, under the laws of New Jersey, acquired a title to the debt due from the Long Island Railroad Company to the Morris Canal and Banking Company. The plaintiff, in his bill, sets forth the statute of New Jersey passed in February, 1829, by which it is declared to be unlawful for incorporated companies after becoming insolvent, or suspending their ordinary business for want of funds, to make any sale, conveyance, assignment, or transfer of any of their property or effects. And by which the court of chancery of that state is authorized to restrain them from so doing, by injunction, and "to appoint a receiver "or receivers; or three trustees, with full power and authority "to demand, sue for, collect and receive, and take into "their possession all the goods and chattels, rights and "credits, moneys and effects, lands and tenements, books, "papers, choses in action, bills, notes, and property of every "description whatever, belonging to the said company, at the "time of their insolvency or suspension of business as aforesaid; "and to sell, convey, and assign allthe said real and personal "estate, c."
The plaintiff avers, that Richards and Selden, being judgment creditors of the Morris Canal Company, in New Jersey, filed their bill against that company, in the court of chancery of that state, alleging its insolvency; and in January, 1842, obtained a decree for an injunction, and for the appointment *Page 337 
of receivers of its property. The decree is set forth in the bill, showing the appointment of three receivers, with the powers enumerated in the statute. He further avers, that the receivers, on or about the 13th of November, 1845, by order of the said court of chancery, duly and properly obtained and entered, assigned the debt now in controversy, due from the Long Island Railroad Company to the Morris Canal and Banking Company, to Skeffington Sanxay, who having held the same as the agent and trustee of the plaintiff, afterwards assigned the same to him. This is the plaintiff's title.
Against its validity, it is objected, on the part of the defendants: First, That it had been assigned to the state of Michigan by the Morris Canal Company, before the time, when, in the bill filed by Richards and Selden, that company was alleged to have become insolvent; and therefore, that the receivers appointed in that suit have neither title in themselves, nor authority to assign it to the complainant in this suit. But if I am right in the view taken of the conveyance to Michigan, this objection fails on the ground that no title passed to that state; and that the Morris Canal and Banking Company remained the owners of this property when the bill of Richards and Selden was filed.
A further objection made to the plaintiff's title is, that the property of the insolvent corporation was not vested in the receivers by force of the statute; but that they were created the agents of the company, and substituted in the place of the directors, for the purpose of settling its affairs. And secondly, as a consequence of their proposition, that the receivers cannot sell or dispose of the property in their own name, but must convey it in the name and under the common seal of the corporation; and we are referred to the case of Willink v. TheMorris Canal and Banking Company, (3 Green Ch. R. page 400,) as an authority for those propositions.
It is true that the chancellor of that state, in some observations not necessary to the decision of the question before him, said in that case, that the property of the corporation does *Page 338 
not vest in the receivers, and that they were substituted in the place of the directors, for the purpose of settling and closing the affairs of the company. But he said, at the same time, that a power was delegated to the receivers to take charge of the property and to sell it. This power is delegated by the statute, and not by the corporation; and the receivers are not appointed by the consent either of the directors or the stockholders. The chancellor does not say, and the case does not warrant the inference, that the receivers are to sell in the name of the corporation, or to use its common seal. There seems to be no more reason for using the name of the corporation in selling its effects, than for a master in chancery in selling lands under a mortgage, or a sheriff in selling goods under execution; and a sale by the receivers under the power delegated by the statute is as effectual to convey the title, as if the right of property was vested in them. In one case, they would convey their own title; in the other, they convey the title of the corporation. The sale is properly the act of the receivers, under the power conferred by statute, and not the act of the corporation. The acts of the receivers, therefore, need not be authenticated by the common seal. The directors may have melted it, or sunk it in the sea, and there is nothing in the statute to require its use by the receivers. The allegation in the bill in relation to the assignment by the receivers, and their authority to assign, is sufficient, and should have been answered by the defendants.
But it is insisted that the assignment by the receivers in New Jersey, admitting it to be valid in that state, has no extra territorial force, and does not operate in this state. Whether it would be valid as against creditors of the corporation proceeding by attachment against it in the state of New York, or as against previous purchasers of the corporation, are questions which do not arise on the record in this case. There is no conflict between the plaintiff's title on the one side, and attaching creditors or purchasers on the other side. We *Page 339 
have already seen, that upon the bill and demurrer, the defendants who claim under the state of Michigan, are not clothed with the character of purchasers. The question, therefore, is, whether the plaintiff's title derived from the proceedings of the court of chancery, in the state of New Jersey, in pursuance of a statute of that state, is to be recognized by the courts of this state, as so far valid that it may be enforced here against the Long Island Railroad Company.
If the defendants are right in their position, that the assignment to the complainant is inoperative in this state, because it was effected by operation of a law of New Jersey, and not by the voluntary act of the corporation, the consequence is, that although the debt against the Long Island Railroad Company belongs in the state of New Jersey to the plaintiff, it belongs in this state to the Morris Canal Company, and that that company must bring the action in this state to recover it. But here a difficulty arises. The order appointing a receiver of the property of an insolvent corporation is accompanied by an injunction restraining the directors of the company from collecting its debts or paying over the avails; and this injunction is general, without reference to the state or country where the debtors may reside. The object of the proceeding in New Jersey is to take everything out of the hands of the corporation, and to put everything into the hands of the receiver.
A suit by the corporation for its own benefit here, is a breach of the injunction in New Jersey, and the suit cannot be brought without incurring the penalty. But suppose the corporation should sue in this state, notwithstanding the injunction in New Jersey, on what ground is it that a foreign corporation can maintain a suit here? The principle that the statutes of foreign states have no extra-territorial force here, if strictly applied, is as fatal to the action by the corporation, as it is to the action by the receiver's assignee.
The corporation is no less the creature of the statute of New Jersey, than is the transfer by the receivers to the plaintiff. *Page 340 
But it is well settled that a foreign corporation may sue in the courts of this state; and equally well settled that such suit is allowed only by the comity existing between one state or country, and another. (Bank of Augusta v. Earle, 13 Peters, 590, 591.) But what kind of comity can that be called, which allows a foreign corporation to sue here, in violation of the law of the state in which it was created? A corporation not allowed to sue in its own state, certainly cannot be allowed by the friendly courtesy of another to bring its action there. The comity which allows a foreign corporation to sue in ordinary cases, would forbid it in a case like the present. But can it be said that the receiver's assignee may bring his suit here in the name of the corporation, for the benefit of the assignee? Prima facie such a suit would be for the benefit of the insolvent corporation, and open to the objection above stated. This could not be removed without showing the receiver's assignment, and obtaining from the court here, a recognition of its validity. Such a recognition would yield the entire principle, not only of the validity of the assignment, but that in a court of equity the suit should be brought in the name of the real owner. The result is, that if this suit cannot be maintained, the debt against the Long Island Railroad Company cannot be collected.
It is a conceded principle, that the laws of a state have no force, proprio vigore, beyond its territorial limits. But the laws of one state, are frequently permitted by the courtesy of another to operate in the latter for the promotion of justice, where neither that state nor its citizens will suffer any inconvenience from the application of the foreign law. This courtesy or comity is established not only from motives of respect for the laws and institutions of foreign countries, but from considerations of mutual utility and advantage. Until the decision of the case of Abraham v. Plestoro, in the court for the correction of errors, (3 Wend. 358,) it had been uniformly held in this state, that in virtue of this comity, the assignees of a foreign bankrupt were entitled to sue for *Page 341 
and recover the debts due to the bankrupt within this state, except where the claim of the assignees came in conflict with creditors in this state, claiming under attachments against the bankrupt's property. (Bird v. Pierpont, 1 Johns. Rep. 118;Bird v. Caritat, 2 Johns. Rep. 342; Holmes v. Remsen, 4Johns. Ch. 460; Holmes v. Remsen, 20 Johns. Rep. 229, 267.) In some of these cases, full effect was given to a foreign assignment in Bankruptcy without qualification. But in the case last mentioned, which was a case of English bankruptcy, the principle was stated with the qualification in favor of American creditors. In that case, a learned and elaborate opinion was delivered by Mr. Justice Platt, in which he denied that the English statutory assignment in bankruptcy created a lien here, so as to deprive American creditors of their remedy by attachment under our laws, but fully admitted the right of those assignees to sue here by virtue of the commission or authorization in England. (See page 267-8 of the case.) In the case of The NewJersey Lombard Bank v. Thorp, (6 Cow. 46,) the right of foreign assignees in bankruptcy to bring suits here was recognized; and trustees appointed by an act of the legislature of New Jersey, by which the property of the corporation was vested in them, were allowed to sue here in their own names.
The case of Abraham v. Plestoro, above referred to, is supposed by the defendants to have established in its strictest sense, and without qualification, the doctrine that a foreign assignment in bankruptcy is absolutely inoperative and void in this state, but I think this a mistake. The point there decided seems to be correctly stated in the reporter's marginal note. It is this, "that an assignee under a foreign commission "of bankruptcy, is not entitled before judgment to an injunction "to restrain the bankrupt from receiving property which "was on the high seas, on its way from England to New York "at the time of suing out the commission." The facts were, that Abraham, being largely indebted in England, left that country, bringing his property or a considerable portion of it *Page 342 
with him, to New York. A commission of bankruptcy was sued out against him in England, and a provisional assignment executed to James Johnston, who followed him to this country, and finding the property in the custom house, filed a bill against Abraham and the custom house officer, and obtained an injunction restraining the collector of the customs from delivering the property to Abraham, and forbidding the latter to receive it. Abraham in his answer, denied that he absconded from England, or that he left there for the purpose of defrauding his creditors, and insisted that the commission of bankruptcy had issued improvidently and illegally. A motion to dissolve the injunction was denied by the chancellor, and Abraham appealed from that decision. The order of the chancellor was reversed, and the injunction dissolved: but on what ground cannot well be ascertained from the report of the case. Two of the judges of the supreme court, and two senators were in favor of affirming the chancellor's order. Opinions in favor of reversal were delivered by Senators Allen, Maynard, Oliver and Stebbins. Senator Allen put the case on several grounds, some of which have no application to the case now under consideration. One of the reasons given by Senator Maynard for reversal was that the assignment to Johnson was provisional merely, and was still open to contestation by the bankrupt, and therefore, the cases holding that a foreign assignment operated as a transfer here, were inapplicable. Senator Oliver, in his opinion, says: "The "question is not whether a foreign assignee shall be permitted "to sue in our courts; in relation to that there can be "but one opinion. Had the proceedings in bankruptcy in this "case been perfected, the bankrupt acquiescing in their justice "and propriety, and the assignee been substituted in his "place, and a question had arisen between him and a debtor "of the estate, no one would have doubted or questioned the "right of the assignee to sue in our courts; but that is not "the case we are considering. The question here is whether "the comity of nations, or in other words, the enlightened *Page 343 
"and liberal principles of jurisprudence, require that we "shall enforce the bankrupt law of a foreign nation, by giving "effect to a statutory assignment, not merely by allowing the "assignee to sue in our courts when the validity and legality "of the assignment is not disputed; but by enforcing the "harsh, rigorous, and penal provisions of a bankrupt law "against the bankrupt himself who denies that he is insolvent, "and insists that if a commission of bankruptcy has "issued against him, (of which he professes his total ignorance,) "it has issued improvidently and illegally." Senator Oliver puts the case still on several other grounds, some of which effect the point we are considering, and others do not. Senator Stebbins, after denying that the foreign assignment wrought a change in the title here, denies also that the assignee was entitled to the injunction, even if he were the owner of the property.
It is impossible, therefore, to say, that the case of Abraham
v. Plestoro was decided on grounds affecting the question now under consideration. It remains entirely uncertain, whether the decision turned upon the point that the foreign assignment was inoperative here; or on the ground that although the assignee may sue the bankrupt's debtor here, he cannot sue the bankrupt himself; or on the ground that the assignment was provisional merely, and therefore imperfect; or on the ground that a foreign assignee, before judgment, is not entitled to an injunction; or on the question whether the proper remedy was not at law.
I have not overlooked the case of Johnson v. Hunt, (23Wend. 87,) in which a different view of the case of Abraham
v. Plestoro was taken, and so far as the decision in that case was founded on that view, I feel myself compelled to dissent from it, and to adopt the principle I have quoted from the opinion of Mr. Justice Platt, in Holmes v. Remsen; adopting at the time what is said by him and by chief justice Taney, in 13 Peters,
590, to the effect that from the intimate political union, and the extensive commercial intercourse between the *Page 344 
American states, and from the similarity of their laws and institutions, we are called upon to encourage and establish a greater degree of comity and courtesy towards one another, than towards the nations of Europe, with whom such relations do not exist.
It is satisfactory to know that the construction above given to the case of Abraham v. Plestoro, and my own conclusions upon the point now in question, are in conformity with the opinion expressed by Mr. Justice Story, in his treatise on the Conflict of Laws, sections 419, 420, 421. In § 420, speaking on this question, he says, it is impossible not to feel that the general current of American authority is in favor of the assignees. "In most of those cases in which assignments under "foreign bankrupt laws have been denied to give a title "against attaching creditors, it has been distinctly admitted "that the assignees might maintain suits in our courts under "such assignments for the property of the bankrupt. This "is avowed in the most unequivocal manner in the leading "cases in Pennsylvania and New York already cited, and it "is silently admitted in those in Massachusetts. And unless "the admission can be overthrown, it surrenders the "principle; for no one will contend that the assignees can "sue either in law or equity in our courts, unless they possess "some title under the assignment."
The case of Harrison v. Sterry, (5 Cranch, 312,) presented only the question of preference between the assignees of a foreign bankrupt and attaching creditors at home; and although the language of the court was general that "the "bankrupt law of a foreign country is incapable of operating "a legal transfer of property in the United States," its meaning as an authority must be qualified by the facts to which it was applied. It was unnecessary for the purpose of that case to state the qualification of the rule asserted; and for that reason probably it was omitted. It was well said by an English chancellor that "it is always unsatisfactory to abstract "altogether the reasoning of the court in any reported case *Page 345 
"from the facts to which that reasoning is meant to apply; it "has a tendency only to misrepresent one judge and to mislead "another." (2 Ball Beatty, 286.)
The only remaining question is, whether the assignment to the plaintiff by the receiver in New Jersey, is void, by the common law of that state for champerty.
It was thought in the court below, that under the terms of the statute already quoted, the receivers had no authority, expressed or implied, to sell any portion of the property of the company, which they had not reduced to possession. In this opinion I am unable to concur. The power to sell is general; and by no means limited by the terms of the statute, to property in the possession of the receivers; it extends to all the estate and effects previously enumerated, and by the generality of its words, embraces the choses in action, rights and credits of the corporation, whether the evidence of the right to recover was in the possession of the receiver or not.
The manifest object and policy of the statute, forbids any other construction. The design of it was to take from the hands of the directors, upon the presumption of their having mismanaged their trust, every valuable thing belonging to the corporation for the purpose of converting it into money, for the payment of debts. And the power of selling the choses in action, rights and credits of the corporation, was given for the benefit of creditors. Their interest requires that the affairs of insolvent operations should be brought to a speedy conclusion, and that the delay consequent upon the slow process of collecting doubtful debts, and litigating contested claims, at the expense of the fund in the receiver's hands, should be, as far as possible, avoided. In many cases this can be best done by a sale. Among the many cases cited in the learned opinion of the superior court, not one is found in which the doctrine of champerty has been applied to a case of this kind, or of the like nature. It does not apply to judicial sales of any description. In Tuttle v.Jackson, (6 Wend. 224,) the chancellor who delivered the opinion in the court *Page 346 
for the correction of errors, declares that the statute against buying and selling pretended titles, cannot apply to judicial sales; and that the common law has never been considered as preventing the change of property, by operation of law or by a sale by the proper officer, under a bona fide judgment or decree of a court having competent authority to order such sale. It does not come within the mischiefs intended to be guarded against by the statute.
The receiver's sale, according to the allegations in the bill, was a judicial sale; and it would be treating the authorities of a sister state with great disrespect, to say that a sale made by order of one of its highest courts, in a matter in which that court has jurisdiction, was made in violation of its own law.
In this state every species of property belonging to a debtor, may be reached, and applied to the payment of his debts upon a judgment creditor's bill; and this may be done by a sale of the property. (1 Paige, 641, Edmonston v. Lyde.) Such sale is free from all objection on the ground of champerty.
The decree made in the superior court, should be reversed, and the decree of the special term of the supreme court affirmed with costs to the plaintiff, of the appeal from the special term, but without costs of appeal to this court.