FORT SMITH WAGON COMPANY *v.* BAKER.

Opinion delivered November 11, 1907.

1. CORPORATION—POWERS OF PRESIDENT.—The president of a business corporation has no power to enter into a contract whereby the entire *corpus* and business of the corporation is sold to another. (Page 451.)

2. SALE OF CHATTELS—INTEREST.—A vendor who was paid a sum in excess of the contract price for articles sold is liable, in a suit to recover the excess, only for interest from date of demand for such excess, and not from date of the payment. (Page 455.)

Appeal from Sebastian Chancery Court; *J. Virgil Bourland*, Chancellor; reversed.

STATEMENT BY THE COURT.

Enterprising citizens of Ft. Smith were anxious to secure a wagon factory at their town. It had come to their notice that the plant of the South Bend Wagon Company, a corporation of Mishawaka, Indiana, was for sale. Accordingly correspondence was opened by the Commercial Club of Ft. Smith, through its secretary, with one F. A. Baker, who was president and treasurer of the Indiana corporation, looking to the purchase of the property of the South Bend Company. Baker in his correspondence submitted to the Commercial Club a list or inventory of the assets of the South Bend Company that were to be sold. This inventory was dated December 1, 1902. C. E. Speer, the president of the Commercial Club, and one Cleveland, a member thereof, some time in January, 1903, went to South Bend, Indiana,

to look over the plant, and to talk with Baker in order to "get his ideas," etc.

On their return to Ft. Smith, a meeting of the Commercial Club was had, and it was agreed that the citizens would raise a bonus for Baker, and make an effort to secure the wagon factory at Ft. Smith.

In the meantime other correspondence with the secretary of the Commercial Club and Baker followed; and the latter sent the following telegram:

"South Bend, Ind., January 25, 1903.

"C E. Speer,

"Ft. Smith, Ark.

"If deal is closed immediately, I will join new organization with two hundred thousand capital, taking fifty thousand stock and thirty-five thousand cash for my values; only ten thousand for good will in this proposition.

"F. A. BAKER."

On the same day he wrote a letter in which he says: "I am just in receipt of a letter this morning from Mr. Miller saying you return home a little disappointed regarding our values, as from observation you thought our figures a little high, but I beg to assure you that such is not the case. However, I feel disposed to make another little concession, as I believe conditions are so favorable at Ft. Smith that I can soon recover, making a gain out of what might appear to be a loss. I also wish to add in this connection that I feel very confident that you will be satisfied with my capability when you see me 'at work.' There is no doubt of my ability to handle a large factory to the entire satisfaction of the stockholders, and after my talk with you I feel that we can make a large success of this matter. In fact, I think so well of it that I do not care to take any bonds whatever, but propose to take $50,000 on stock and $35,000 in cash for my values here. It will be necessary for me to have this amount of money to *liquidate the liabilities of the old company and buy out the other stockholders.*" (Here he confirms proposition in telegram makes suggestion as to amount

of capital stock.)   Then he continues:   "As stated to you when here, I will close out all my interest here with the expectation of investing everything in Ft. Smith and making that my future home.   It will be necessary for the matter to be settled one way or the other at once, owing to the fact that this is time of the year we contract for our season supply of materials of all kinds, so I will thank you to wire me your decision at the earliest possible moment, and if you think it advisable I will go to Ft. Smith and assist in completing the organization, and decide upon a location.   Even if we get started at once, it will be probably fall before we can get the plant in operation, as there is a great deal to be done."

In a letter of January 28, 1903, Speer replies, acknowledging the telegram and letter, and, after expressing his disappointment at what he had seen at South Bend, he says: "In viewing the matter from your standpoint, it is not difficult for me to see the many sacrifices of a personal nature you would have to make, and I can not criticise you in any way for trying to get some recompense for this surrender of a lifetime association.   At the same time I do not feel that those who associate themselves with you to make an effort to make a success of the enterprise here, and [which] if successful will satisfy your life's ambition, should pay any premium for these privileges.   In other words, I think your plant ought *to be invoiced to the new organization for its present intrinsic value, so that the profits of the first year will not have the burden of a fictitious value to overcome.*   I am telling you all this without having consulted Mr. Cleveland, whose judgment I regard as good, and who will have considerable influence on me when I see him.   I had the matter up before our Commercial Club last night, and there was considerable interest shown, and I believe that a reasonable bonus for the institution can be secured."   Then, after reciting certain advantages that would follow the undertaking, should they go into it with all their "ideas harmonious," he concludes: "I will write you again just as soon as I have an opportunity of talking with Mr. Cleveland.   We appreciate fully the importance to you of having this matter determined at once, and

we will not delay longer than is absolutely necessary to satisfy ourselves that we are making no mistake."

The work of raising a bonus went on, and on February 23, 1903, the bonus having been secured, C. E. Speer wrote Baker the following letter: "Our bonus committee have gotten far enough along now for me to make you a definite proposition, and that is, *if you will invoice your material and machinery at its present value to the new organization,* we will give you the $10,000 bonus that our people have raised. Of course, in making inventory to the new company, they would only want to take that part of your plant that would be valuable down here. If you are satisfied, and we can arrive at an agreement along the lines I have just indicated, I think it would be a good idea for you to come down here now."

Soon after receiving the above letter, Baker went to Ft. Smith, where he and C. E. Speer, who conducted the negotiations for the Ft. Smith people, entered into the contract for the sale and purchase of the assets of the South Bend Wagon Company by the Ft. Smith Wagon Company. The terms of the contract as stated by Speer were that he bought of F. A. Baker the assets of the South Bend Wagon Company, as contained in an inventory of December 1, 1902, as a basis of the sale, and that such assets would invoice a sum, in the aggregate, in excess of $70,000. That the consideration to be paid Baker was ten thousand dollars, that had been raised as a bonus, and the price of the assets on hand, taking the inventory of December 1, 1902, as a basis for the amount on hand, and the value thereof, as per invoice of that date. That this consideration was to be paid to Baker in stock of the Ft. Smith Wagon Company factory to the amount of $40,000, the $10,000 cash bonus, and the balance of the invoice price in cash paid by the Ft. Smith Wagon Company.

As stated by Baker: "The contract was that I was to undertake to sell to a company which was to be organized here all of the movable assets of the South Bend Wagon Company of Mishawaka, Indiana, at a stipulated price of $70,000, a flat price, and in addition to that sum I was to receive $10,000 as a bonus

coming from the Commercial Club, making the total transaction $80,000."

After the contract of sale was agreed upon, the Ft. Smith Wagon Company was incorporated, F. A. Baker was made the president, and at a meeting of its directors on March 7, 1903, a resolution was adopted appointing George W. Cleveland "to go to South Bend and check in the assets of the South Bend Wagon Company, and to see that the title to said property is clear and proper transfer made."

In pursuance of this resolution, Cleveland went to South Bend, taking with him the inventory of December 1, 1902, and he and the bookkeeper of the South Bend Company went over the assets of said company, and checked the stock with the inventory, and extended the values as per the invoice book or prevailing prices of that date, making allowances for any differences that had taken place in the amount of assets on hand at the time the inventory of December 1, 1902, was taken, and the assets on hand March 16, 1903, when they were checking up the stock. They found by this method that the total value of the assets on hand March 16, 1903, was $67,257.37.

Cleveland called Baker's attention to the fact that he understood that the value of the total assets to be turned over to the Ft. Smith Wagon Company was not to be less than $70,000. Whereupon Baker informed him that his contract with the Ft. Smith Wagon Company, as he understood it, was that he was to receive a flat price of $70,000 for the assets on hand at the time they were delivered, and that it was the duty of Cleveland simply to check up the assets with the inventory to see what was on hand, that he had nothing to do with ascertaining the values. He told Cleveland, so Cleveland testified, that the difference was small, and that he would adjust the matter with the directors of the Ft. Smith Wagon Company. Upon this promise by Baker that he would adjust the matter of the difference between the $70,000 and the $67,257.37, Cleveland says he consummated the deal by paying Baker $40,000 and taking a bill of sale, which is as follows:

"This agreement witnesseth that the South Bend Wagon Company, of the city of Mishawaka, in the State of Indiana, has sold, and by these presents does hereby convey and transfer, to the Ft. Smith Wagon Company of the city of Ft. Smith, in the State of Arkansas, for and in consideration of the sum of eighty thousand dollars ($80,000) the following personal property now owned and held by said South Bend Company, towit: "All fixtures and machinery now in its factory and plant at Mishawaka, Indiana, and in use therein; all lumber, timber, iron, paint and other material of whatsoever kind now on hand, in the rough or partly or wholly finished, for use in its business of wagon manufacturer; all finished and partly finished wagons now on hand, or in process of construction, including its stock of wagons at Kansas City, Missouri, and at Kingfisher, Oklahoma; and all of its stock of wagon repairs, at the factory, in Mishawaka, and at Kansas City, Missouri, and at Kingfisher, Oklahoma; intending to convey hereby all of the stock in trade, fixtures and good will of said South Bend Wagon Company to the said Ft. Smith Wagon Company as per inventory of March 16, 1903, copy furnished. There is not included in this conveyance, nor is it intended to convey by this bill of sale, any of the notes, bills and accounts receivable belonging to said South Bend Wagon Company, nor any of the shares thereof, nor any of its real estate, nor any shares of stock held by it in any other corporation or company.

"Witness the seal of the South Bend Wagon Company and its signature by its president and treasurer and secretary thereunto duly authorized, this sixteenth day of March, 1903.

."South Bend Wagon Company,
"By F. A. Baker, Pres. and Treas.
"M. M. Baker, Secretary."

The property was received by Cleveland as the representative of the Ft. Smith Wagon Company, and by him turned over to F. A. Baker, who received it as the president of the Ft. Smith Wagon Company. From that time on till about the first of January, 1904, the plant was operated by the Ft. Smith Wagon Company at South Bend. From January to April, 1904, the assets were being moved from South Bend to Ft. Smith.

The stock of $40,000, covering balance, was issued, $33,500 to F. A. Baker, and $6,500 to Mrs. Minnie Baker, in February, 1904. It was known by Speer and Echols, two of the members of the executive committee, of whom Baker was the third, that the assets taken over by Cleveland for appellant did not amount to $70,000 so as soon as Cleveland returned and made his report. Baker says that he visited Ft. Smith often after the bill of sale was executed, and before he moved to Ft. Smith permanently in April, 1904, and had frequent talks with Speer and Echols, and that the fact that he was expected to make good the difference between the $70,000 and $67,257.37 was never mentioned to him for more than a year after the deal was closed, and when it was mentioned he contended that he was to receive a flat price of $70,000 for the assets on hand March 16, 1903. And yet suit was not directed to be brought against him until September 24, 1904.

This suit was instituted in obedience to the resolution of the directors of the Ft. Smith Wagon Company against appellee to recover for breach of contract the sum of $2,742.63 with six per cent. interest from March 16, 1903, and asking for judgment for said amount, and that same be declared a lien on the stock of Baker in the Ft. Smith Wagon Company, and that same be sold to satisfy said judgment.

The appellee presented two defenses: First, that, if there was a contract between appellant and appellee, the latter had complied with its terms, and hence there was no liability created by such contract against appellee. Second, that the contract upon which appellant sues, and which it sets up, was made by appellant with the South Bend Wagon Company, a corporation of Indiana, and not with appellee *individually.* And that therefore, if there be a liability, it is not the liability of appellee.

The court found "that the contract sued upon herein was made by and between the South Bend Wagon Company and the Ft. Smith Wagon Company, and the said F. A. Baker was not a party thereto." And upon this finding the court dismissed the action without going into the merits of the case. The plaintiff duly excepted, and prayed an appeal, which was granted. Other facts are stated in the opinion.

*Read & McDonough*, for appellant.

1. There is a sharp conflict in the testimony as to the terms of the contract, but the contention of plaintiff is sustained by *positive* testimony and all the circumstances and weight of reason.

2. There is no doubt as to the breach of the contract. Courts scrutinize with jealous care all transactions between directors as officers and individuals, and require them to be characterized by good faith and conscientious discharge of official duty. 127 Fed. 274; 3 Thompson on Corporations, § 4059, 4063; 79 Pac. 6; Thompson on Corporations, § 4024, and note.

*Mechem & Mechem*, for appellee.

1. There was no error in finding that the contract was made with the South Bend Wagon Company, and not with defendant individually.

2. A dismissal must result because the evidence fails to show a contract such as the complaint alleges and fails to show breach.

3. Appellee was not a party to contract.

WOOD, J., (after stating the facts.) Treating the questions in the order presented in briefs of the counsel:

1. The evidence disclosed that the citizens of Fort Smith were as anxious to secure the services of an experienced wagon factory man to manage the business as they were to secure the plant itself. The proposition of Baker, as per his original telegram, was to join the organization, taking $50,000 of stock himself and the $10,000 of bonus raised by the citizens was for the purpose of inducing Baker to come to Fort Smith. Baker, it appears, had impressed the members of the Commercial Club, at least the leading spirits in the enterprise, with his superior qualifications as a wagon factory manager and expert. And they were looking for such an one to place at the head of the new enterprise. The proposition of Baker was that the $10,000 of bonus were to go to him, and he evidently received it. True, the deal, as shown by Cleveland, Speer and Baker, was for the property of the South Bend Wagon Company. It did not belong to Baker individually. All understood that.

Hence Cleveland said that he took the bill of sale, because he understood that he was getting "the stuff from the South Bend Wagon Company."

While Speer at one place in his testimony says "that he was dealing with the South Bend Wagon Company, Mr. Baker being its representative," in another place he says: "We were dealing with Mr. Baker. We did not know how much stock he represented. In his statement he said he would have to have a certain amount of cash to go back and buy out the other stockholders." And in still another portion of his testimony, on redirect examination and in explanation of his statement before, he said: "Mr. Baker is the only party we had any dealings with. We had no contract with the South Bend Wagon Company as a corporation at all unless it was represented by Mr. Baker, as the South Bend Wagon Company. Mr. Baker was the only person I knew in the contract." So, taking his whole testimony together, we think it clear that Speer meant that he was dealing with Baker individually for the sale by him of property that belonged to the South Bend Wagon Company. In other words, Baker was to sell to the Ft. Smith Wagon Company property that he was to obtain in his individual right from the South Bend Wagon Company, the corporation.

We think, taking all the testimony in the record on this branch of the case, that this is the correct conclusion. The bill of sale does not conflict with this view at all. For, to avoid circuity in the transfer of the title of the South Bend Wagon Company to Baker and then to the Ft. Smith Wagon Company, the bill of sale was made direct to the Ft. Smith Wagon Company from the South Bend Wagon Company. This was legal, and certainly the most direct method of making the transfer. Nor does the fact that the $40,000 received by Baker were entered upon the books of the South Bend Company and used in the usual way conflict with this view. But we are of the opinion that the testimony of Baker himself tends to support the conclusion that in making the sale he was acting for himself individually. For when asked: "What was the contract?" he replied: "The contract was that I was to undertake to sell to a company to be organized here all of the movable assets of the

South Bend Wagon Company, of Mishawaka, Indiana, at a stipulated price of $70,000, a flat price, and in addition to that sum I was to receive $10,000 as a bonus."

The statement in his letter of January 25, 1903, towit: "It will be necessary for me to have this amount of money to liquidate the liabilities of the old company and buy out the other stockholders," shows conclusively that it was an individual transaction with Baker. For, if it had been a sale by the corporation, it would not have been necessary *for Baker to buy out the other stockholders.* This ends the controversy as to whether Baker was acting in his individual capacity or as the representative of the company, and shows that the court erred in its finding and conclusion.

The only way appellee could have successfully overcome the proof that Baker was acting in his individual capacity would have been to show that he was authorized by the corporation through its stockholders and directors to make the sale for the corporation. For, in the absence of such authority, the president of a corporation has no power to enter into a contract whereby the entire *corpus* and business of the corporation is sold to another. 4 Thompson, Corp. § 4632; *Stokes* v. *New Jersey Pottery Company,* 46 N. J. L. 237; *Hoyt* v. *Thompson,* 5 N. Y. 320; 2 Cook on Corp. § 716, note; 10 Enc. 927. See *City Electric Street Ry. Co.* v. *First National Exch. Bank,* 62 Ark. 33.

2. The court did not pass upon the question as to what were the terms of the contract; but, as the proof has been fully developed on this subject, it is our duty to render such decree as the lower court should have rendered. Both Speer and Baker agree that the inventory of December 1, 1902, was the basis of contract as to the amount of property to be delivered, and there is substantially no conflict between them that, in the final transfer, the Ft. Smith Wagon Company was to get all the assets of the South Bend Wagon Company that would be of value to the former, except real estate, stock in other companies, the notes and accounts, etc. The Ft. Smith Wagon Company was to get all the machinery and material on hand at the time the transfer was actually made that would be of value to it, and

the basis for the amount of this was to be the inventory of December 1, 1902, with such changes only as would occur in the stock by reason of having run the business in the usual way from December 1, 1902, when the inventory was made, till March 16, 1903, when the actual transfer was made. As to this there is no conflict between the parties who made the contract.

But appellant contends that it was to have the assets as shown by the inventory of December 1, 1902, with any material that had been manufactured into wagons or put in altered form, and any added assets at the price as shown by the invoice of such machinery, material, etc.; while the appellee contends that the price that was to be paid for the assets at the time of the transfer was to be the flat sum of $70,000, regardless of what the invoice of the assets on hand at the time of the transfer should show. Appellee also contends that the assets, properly inventoried and invoiced, would amount to more than $70,000; whereas appellant contends that the invoice of the assets according to the terms of the contract on the basis of the December 1, 1903, inventory, and the invoice of the articles on that inventory and those altered in form or added since, show that the value of the assets delivered to the appellant under the contract of sale was $67,237.37.

Upon these disputed questions of fact there is a sharp conflict in the evidence. Analysis of the evidence and discussion of the facts in detail would not be useful as a precedent. Our conclusion is that the fair preponderance of the evidence on these points is in favor of the contention of appellant.

We are controlled largely in this conclusion by the letter of Speer to Baker of Januay 28, 1903, in which he says: "I think your plant ought to be invoiced to the new organization *for its present intrinsic value, so that the profits of the first year will not have the burden of a fictitious value to overcome."* And the letter of February 23, 1903, in which he makes the definite proposition: "That if you will invoice your material and machinery *at its present value* to the new organization, we will give the $10,000 bonus that our people have raised." This undoubtedly supports appellant's contention that the assets of the South Bend Wagon Company were to be sold at their invoiced price

to appellant, and not as contended by appellee for the flat sum of $70,000.

The testimony of Cleveland, the representative of appellant who was sent "to check in" the assets purchased, and the testimony of Darland, the bookkeeper of the South Bend Wagon Company, shows that the invoice taken by them on March 16, 1903, was correct as to the assets then on hand. Cleveland says that approximately everything included in the December 1, 1902, inventory was on hand at that time; that but little had been done; that it was all there, only some of the raw material was in altered form.

Darland prepared a statement of the business that had been done, showing purchase, sales, receipts and disbursements between December 1, 1902, and March 16, 1903. This, in connection with the inventory of December 1, 1902, and invoice books, enabled them to make a complete and correct invoice of the assets on hand when the transfer was consummated. And they show from these sources that the total valuation was $67,257.37.

Baker's testimony tended to show that the inventory did not include all the assets on hand, and that, even if the inventory were correct, it was not a true invoice, for the reason that there had been an advance in the value of the articles inventoried of from five to ten per cent. since the inventory of December 1, 1902. And, according to his testimony, this would more than bring the value of the assets to $70,000, even if that was to be the minimum valuation under the contract. But the testimony of Johnson, the secretary and treasurer of the Ft. Smith Wagon Company, tends to show that the invoice by Cleveland was the full value of the assets transferred. And the loss which he shows that the Ft. Smith Wagon Company sustained during the time between March 16, 1903, and January 1, 1904, when the business was operated at South Bend under the management and control of Baker, tends to corroborate his opinion. For, if there was an advance in prices, and the tendency of the market was upward, it seems unreasonable that assets, which were deemed by appellee to have been worth $70,000 or more in March, 1903, should have been worth some ten thousand less

in January, 1904, unless there had been some gross mismanagement and losses that are not shown by the proof. Moreover, the invoice of March 16, 1903, taken by Cleveland and Darland, shows that sixteen and two-third per cent. was added to the valuation of the unfinished material, and that twelve and one-fourth per cent. was added to the valuation of the finished stock to cover the possible advance in the price of such material between December 1, 1902, and March 16, 1903.

The fact that the consideration in the deed was named at $80,000 and that Cleveland paid over the $40,000 knowing that the assets invoiced only $67,257.37, and the further fact that stock to the full amount of $40,000 was issued to appellee, and Mrs. Minnie Baker, at his direction long after it was known to appellant's executive board that the assets received only amounted to $67,257.37—I say that these facts, unexplained, would tend strongly to support appellee's contention that the contract price for the assets on hand at the time of the transfer was the flat sum of $70,000. But the explanation of this by Cleveland was that he paid over the $40,000 to Baker after he had promised to adjust the matter with the board of directors. And the members of the executive board explained that the stock was issued because Baker was the president of the corporation, and they had full confidence in him, and expected him to bring the matter up for adjustment. This he failed to do, and when his attention was first called to it he claimed that he did not owe anything. Finally formal demand was made upon him, and upon his refusal to pay suit was directed to be brought against him September 24, 1904. We are of the opinion that this explanation of the payment of the $40,000 and the issuance of stock without demanding further adjustment at that time is satisfactory, and that the appellant is not precluded from maintaining the suit on that account.

But the sum due should only bear interest from the date of formal demand upon him for payment, towit: September 24, 1904. The judgment, for the error indicated, is reversed, and the chancery court is directed to enter a decree for the sum of $2,742.63 with interest at six per cent. from December 24, 1904, and to declare same a lien upon stock of appellee in appellant

corporation. And to order same sold unless judgment is satisfied according to the statute in such cases provided, and for further proceedings not inconsistent with this opinion.

BATTLE, J., dissenting.