## Case No. 2,583.

### The CHAMPION.

[1 Brown, Adm. 520;[1] 1 Am. Law T. Rep. (N. S.) 493; 7 Chi. Leg. News, 1.]

District Court, E. D. Michigan. Sept., 1874.

MARITIME LIEN — SUPPLIES FURNISHED IN CANADA—RIGHT OF ASSIGNEE TO SUE.

1. By the law of England previous to the statute of 3 & 4 Vict., no lien existed for supplies furnished domestic vessels.

[Cited in The Union Express, Case No. 14,-364; Whittaker v. The J. A. Travis, Id. 17,599.]

2. Whether such lien existed with respect to foreign vessels, or whether the court of admiralty had jurisdiction to enforce it, seems never to have been settled prior to the passage of the act of 3 & 4 Vict. This statute was, however, simply declaratory of the maritime law with respect to the existence of the lien as it was prior to its passage, and vested jurisdiction to enforce it in the admiralty courts.

[Cited in The Champion, Case No. 2,584.]

3. Want of jurisdiction to enforce a lien in any particular locality is not fatal to the existence of the lien. The lien exists by virtue of the general maritime law—it follows the ship wherever she goes, and may be enforced wherever there is jurisdiction to enforce it.

[Cited in The Union Express, Case No. 14,-364.]

4. There is a lien in Canada for supplies furnished an American vessel, and a court of admiralty has power to enforce this lien.

5. A lien for supplies is divested by an assignment of the claim.

[Cited in The Napoleon, Case No. 10,011; The Emma L. Coyne, Id. 4,466; The Sarah J. Weed. Id. 12,350; The Rapid Transit, 11 Fed. 335.]

[See note at end of case.]

In admiralty. This was a libel in rem by James O'Leary for wood supplied the tug Champion by the libellant at Lampton, on St. Clair river, in the province of Ontario, in October and November, 1871. The tug was a vessel of the United States, and owned and registered at Detroit, in this district. The libellant was a citizen of Ontario and a subject of Great Britain. Before the suit was brought, O'Leary had assigned his claim to Johnson & Co., brokers and bankers, of Port Huron, in this district, and the suit was brought at their instance and for their bene-

fit. The claim was evidenced by drafts drawn by the master of the tug upon the owner. After the suit had been commenced, and before the hearing, Johnson & Co. withdrew the drafts from the hands of their proctors, and, without further consultation or co-operation with them, made a settlement with and received payment from the owner of the tug, but not including costs, and without any reservation as to costs, and delivered up the drafts. The proctor's costs have not been paid. Libellant's proctors now ask for a decree for the same.

This is opposed on behalf of the owner of the tug, on three grounds: First. That by the laws of the province of Ontario, where the supplies were furnished, there was no maritime lien for the same; and that therefore libellant had no right of action in rem, and the court was without jurisdiction in the premises. Second. That any lien which may have existed in favor of libellant ceased on the assignment of his claim to Johnson & Co. Third. That in any event, the proctors having voluntarily delivered up to Johnson & Co. the evidences of claim, and thus enabled them to make a full and complete settlement with the owner, the proctors cannot now, without proof of collusion, look to the tug or her owner for their costs, but must look to Johnson & Co. alone. Upon the question of lien, it is conceded that if a maritime lien for supplies had an existence in Ontario in any case, it had in this. There are several other suits against the tug in behalf of Canadian parties, for supplies, depending substantially upon the same questions as the present case; and the decision in this case was to determine the others.

L. S. Trowbridge, for libellant.

(1) The question of jurisdiction in cases of supplies furnished in Canada is conclusively settled in the case of The Maggie Hammond, 9 Wall. [76 U. S.] 451. It is not a question of jurisdiction, but of comity. This case was followed by the circuit judge of this circuit in that of The Avon [Case No. 680].

(2) The question of assignment is not free from doubt. The authorities are conflicting, but upon principle the lien should be preserved. In other cases an assignment of the debt carries with it the security, as in case of indorsement of note secured by mortgage. Conceding the lien to be a personal right, why should it be lost by assignment? The want of power to assign by so much lessens the value of the lien. The Boston [Case No. 1,669]; The General Jackson [Id. 5,314]; The Wasp, L. R. 1 Adm. & Ecc. 367; Sorley v. Brewer, 1 Daly, 79. In the following cases a mechanic's lien was held assignable: Iaege v. Bossieux, 15 Grat. 98; Tuttle v. Howe, 14 Minn. 145 [Gil. 113]; Goff v. Papin, 34 Mo. 180. It is a general rule well settled that whatever rights of action survive to an executor are assignable. People v. Tioga Common Pleas, 19 Wend. 73; Sears v. Cono-

---

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

ver, 34 Barb. 330; Hoyt v. Thompson, 1 Selden [5 N. Y.] 320.

F. H. Canfield, for claimant.

(1) This being a proceeding in rem, the jurisdiction depends upon the existence of a lien in favor of the libellant against the tug. The Rock Island Bridge, 6 Wall. [73 U. S.] 213; Gardner v. The New Jersey [Case No. 5,233]; Harmer v. Bell, 7 Moore, P. C. 267; 2 Pars. Shipp. 172 (note 2), 322. A maritime lien is defined in The Young Mechanic [Case No. 18,180]. If the debt in these cases created a lien, that lien existed and was in full force at the moment the supplies were placed on board the vessels while they lay in the Canadian port. If the liens did not exist then and there, they never existed. The Two Ellens, 1 Asp. 208-211. This action being founded in contract, the existence of the lien depends upon the law of Canada—the lex loci contractus. Story, Confl. Law, §§ 321, 322b; Whiston v. Stodder, 8 Mart. (La.) 95, 134; The Avon [supra]; The Peerless, Lush. 30. Whether there was a lien created depends upon the intention of the parties; they contracted with reference to the law of the place, and that law became part of the contract. By the law of Canada no such thing as a maritime lien for supplies exists. It is not merely the want of a court capable of enforcing it. The only expert sworn so testifies. The fact that no such lien exists is fully shown by the authorities. By the law of England no such lien existed till 1840. The Neptune, 3 Knapp, 94; Abb. Shipp. 142-144, and cases cited; The Two Ellens, 1 Asp. 40, 208, 210. By virtue of the conquest, and subsequent acts of the British government, the law of England, as it then existed, became the law of Canada. 1 Cooley, Bl. 108; Baldwin v. Gibbon, Stu. K. B. p. 72; Hamilton v. Fraser, Id. 21; 1 Chit. Commer. Law, 638; Blankard v. Galdy, 4 Mod. 222; 16 Am. St. P. 36; Campbell v. Hall, Cowp. 204; Mitchell v. U. S., 9 Pet. [34 U. S.] 748. The recent English statutes do not apply to Canada. The act of parliament under which the government of Canada was organized, expressly provides that the English statutes shall not apply to the Canadas unless they are named or referred to by necessary intendment. These colonies have full power of local legislation upon this subject. 1 Cooley, Bl. 109; 7 & 8 Wm. III. In 1791 Canada was divided, and in October, 1792, the legislative council of Upper Canada, by express enactment, declared the laws of England should be the rules of decision in all civil cases. See Consol. St. Up. Can. p. 30. The recent English statutes on this subject do not apply to the upper province. It would seem, also, they do not apply to the lower province. See The Australia, Swab. 480-488, where it is held the jurisdiction of the vice-admiralty courts remains as it was previous to 1840. By the law of Canada, full power of legislation is given to its parliament in respect to navigation and shipping. Debates on Confederation of Provinces, p. 1029; Laws Up. Can. 448, 456, 535. The English courts of admiralty, in cases arising in the colonies, are bound by the local law. The Peerless, Lush. 30.

(2) If any lien ever existed it was divested by the assignment of the claim to Johnson. Cross, Liens, 48; The Yankee Blade, 19 How. [60 U. S.] 82; Logan v. The Aeolian [Case No. 8,465]; Rusk v. The Freestone [Id. 12,143]; Patchin v. The A. D. Patchin [Id. 10,794]; The Geo. Nicholaus [Id. 13,578]; Reppert v. Robinson [Id. 11,703]; Pearsons v. Tincker, 36 Mo. 384; Hays v. The Columbus, 23 Mo. 232; The White v. Levy, 5 Eng. (Ark.) 411. Same rule applies to mechanics' liens. Lovett v. Brown, 40 N. H. 511; 2 Kent, Comm. 635, note. The right of stoppage in transitu can only be enforced as between the buyer and seller. Pars. Mer. Law, 60; Siffken v. Wray, 6 East, 371.

L. S. Trowbridge, in reply.

Claimant's counsel assumes the position that by the conquest of Canada the French or civil law was superseded by the law of England. If this position be untenable his whole argument falls to the ground. While under the dominion of France, there is no question that the general maritime law prevailed there, and that by it a lien existed in favor of material-men. The conquest did not alter this, and the same general maritime law prevails there, unless changed by positive enactment. Blackstone, in speaking of the colonies of the mother country, makes a nice distinction between colonies that are established by discovery and those which are gained by conquest. As regards the former, all the laws of the mother country in being at the time of the establishment, are immediately in force in the colonies. "But in conquered or ceded countries, that have already laws of their own, the king may, indeed, alter and change those laws, but till he does actually change them the ancient laws of the country remain, unless such as are against the law of God, as in the case of an infidel country. Our American plantations are principally of this latter sort, being obtained in the last century either by right of conquest and driving out the natives (with what natural justice I shall not inquire), or by treaties. And therefore the common law of England, as such, has no allowance or authority there, they being no part of the mother country, but distinct though dependent dominions." 1 Cooley, Bl. pp. 107, 108. While the opinion of the learned author might be questioned, as to the statement that American colonies (i. e., those not included in the United States) were obtained by conquest, instead of discovery, no question can arise as to the Canadian colonies. The case cited by counsel from Stuart's Lower Canada Reports (page 72), does not conflict with the above. It was there held that the French

law was suspended by the conquest, and the establishment of an admiralty court, the very thing which Blackstone says the king can do, but until he does it the ancient law remains. There has been no such act regarding Upper Canada, and the conquest alone would not have the effect to supersede the French law.

J. W. Finney and H. H. Swan, on same side.

(1) The lien exists by the general maritime law, even in the absence of a remedy in rem for its enforcement. Farmer v. Davies, 1 Term R. 109; Rich v. Coe, Cowp. 639; Abb. Shipp. p. 157; The Rebecca [Case No. 11,619]; 3 Kent, Comm. (8th Ed.) 281; The Phoebe [Case No. 11,064]; The China, 7 Wall. [74 U. S.] 68; Dupont de Nemours v. Vance, 19 How. [60 U. S.] 171. The jurisdiction to enforce this lien was formerly denied in England, but in this country has always been admitted. La Constancia, 2 W. Rob. Adm. 487; Briggs v. The Light Boat, 11 Allen, 158; The Siren, 7 Wall. [74 U. S.] 152; The Davis, 10 Wall. [77 U. S.] 19; The Maggie Hammond, 9 Wall. [76 U. S.] 451; The Jerusalem [Case No. 7,294]; The Chusan [Id. 2,717].

(2) The contract of the master here is governed by the general maritime law, and not by the lex loci. Pope v. Nickerson [Case No. 11,274]; Story, Confl. Laws, § 286b; The Nelson, 1 Hagg. Adm. 169, 175, 176.

(3) The act of 3 & 4 Vict. c. 65, enlarging admiralty jurisdiction, extends to the colonies, though not named, and impliedly repeals the statute of 1792. The Wataga, Swab. 165.

LONGYEAR, District Judge. The argument of respondent's advocate in support of the first ground of defense—that there was no lien by the lex loci contractus, and therefore no right of action in rem in this court—is based upon the following propositions: First. That the laws of France which prevailed in Canada at the time of its conquest by England, and by which there was a lien for necessaries supplied to a ship, had been superseded by the laws of England. Second. That a lien for necessaries supplied to a ship, whether domestic or foreign, never had an existence in England until it was created by act of parliament. Third. That the act of 3 & 4 Vict. c. 65, § 6 (in 1840), creating a lien in such cases, had no operation in Upper Canada, now province of Ontario, because not so expressly named and provided. Fourth. That such was the state of the law in the province of Ontario in October and November, 1871, when the cause of action in this case arose. The arguments were confined to these propositions, and were conducted on both sides with commendable zeal and ability, and elaborate research. I have also received much aid from an instructive brief of Messrs.

H. H. Swan and J. W. Finney, proctors and advocates for libellants in another suit now under advisement, and in which this same question is involved.

It will be seen that the second proposition lies at the foundation of the entire argument; because it is only by maintaining it that the others are of any consequence. The second proposition will therefore be first considered. In considering this proposition, it must be borne in mind that the Champion was a vessel of the United States, and therefore foreign to the place where the necessaries were supplied.

It is too well settled and understood to need citation of authorities or admit of discussion, that, as to domestic vessels, jurisdiction to enforce the lien accorded by the maritime law to material-men, by action in rem in the admiralty or elsewhere, was long since overthrown and denied in England, and the lien itself held never to have had any existence there. Such has hitherto always been the rule in the United States also, where the maritime law was at first adopted as it was administered in England, together with all its inconsistencies and incongruities as applied to the condition of things here. The incongruity of limiting the jurisdiction to tide water has already been abandoned, and has ceased to mar the harmony of the system; and, judging from the recent amendment of admiralty rule 12 by the supreme court, and certain foreshadowings by recent enunciations from the bench of that court, and to which may be added a recent decision by the district court for the eastern district of Missouri, it is evident that this other is about to meet the same fate. Wilson v. Bell, 6 Chi. Leg. N. 261; Taylor v. Com. [Case No. 13,788]. But it is by no means so well settled, although seemingly so understood, that the denial of jurisdiction in the admiralty to enforce liens of material-men extended to necessaries supplied in England to foreign vessels, and much less so in regard to the existence of the lien in such cases. It is true it seems to be assumed by Mr. Abbott, in his excellent work on Shipping (pages 142 to 150), and it was no doubt held by the court of king's bench, that the denial went to that extent, both as to the jurisdiction and the existence of the lien. To my mind, however, it is apparent from the notes to those pages of Abbott, and the cases there cited and commented on, in both text and notes, that the controversy in this respect between the admiralty and common law courts of England, never was entirely settled and determined, the one way or the other; that, in fact, that controversy continued as to foreign vessels, until it was finally disposed of and determined in favor of the admiralty, by the statute of 3 & 4 Vict., supra. The high court of admiralty did not understand the denial to have gone to the extent claimed, certainly as late as 1834. In that year, in the case

of The Neptune, 3 Hagg. Adm. 129–140, 8 Eng. Adm., Sir John Nicholl, delivering the opinion of the court, says: "In England, then, the law of nations, of which the lex mercatoria is a branch, forms part of the common law, unless it be altered or controlled by parliament or the municipal courts. It is clear that, by the civil law, and by the general law of other nations, when uncontrolled, persons who have furnished materials for the fitting out of a ship, have a lien upon the ship itself, and, if so, upon the proceeds of the ship. If an English ship were repaired in France or in Holland, material-men might there arrest and enforce payment against the ship itself. How far a foreign ship repaired here might not be subject to the same right is a question into which it is not necessary now to inquire, for the Neptune is a British ship, and in such case the municipal courts of this country have so far departed from the rule of the civil law that they have held that the lien does not extend to the ship itself; and so far, therefore, this court is restrained; but they have not gone further." It is true the Neptune, being a domestic ship, and the repairs having been done in England, and the application in that case being to participate in surplus proceeds, and not a proceeding against the ship itself, the point thus discussed was not directly involved; but what was said none the less shows that, in the opinion of Sir John Nicholl at least, the question of lien for necessaries supplied to a foreign vessel in England had not then passed beyond controversy in her courts. The judgment in that case was afterwards reversed by the privy council (2 Knapp, 84), on the ground that it allowed a party to participate in proceeds who had no lien upon the vessel itself. It became a leading case, and was deemed a final determination of the question of lien for necessaries supplied in England, so far as it related to domestic ships.

The statute of 3 & 4 Vict., supra, must be regarded, I think, as declaratory, or at least as a recognition merely, of what the maritime law then was, so far as concerned the question of lien for necessaries supplied to a foreign ship, whether within the body of a county or upon the high seas, and not as introducing a new principle into English jurisprudence. This, I think, is abundantly evident from the language of the enactment itself, which is as follows: "The high court of admiralty shall have jurisdiction to decide all claims and demands whatsoever in the nature of salvage for services rendered to or damage received by any ship or sea-going vessel, or in the nature of towage, or for necessaries supplied to any foreign ship or sea-going vessel, and to enforce payment thereof, whether such ship or vessel may have been within the body of the county, or upon the high seas, at the time when the services were rendered or damage received or necessaries furnished in

respect of which such claim is made." Abb. Shipp. 150. It will be noticed that the act does not purport to create a lien. It leaves that question just where it stood before, and, of course, to be determined by the maritime law. It seems to assume the existence of the lien, and then simply restores to the admiralty a jurisdiction in relation to it, of which it had been deprived by the municipal courts. That this is the light in which that act was regarded by the high court of admiralty is evident by the subsequent decision of that court in at least two cases—one, The Alexander, 1 W. Rob. 288, soon after the act went into operation [holding that the jurisdiction conferred by the act was not confined to cases of necessaries supplied after it went into operation][2] and the other, The Wataga, Swab. 165, at a later period (1856), holding that the jurisdiction conferred by the act extended to claims for necessaries supplied to a foreign vessel in colonial as well as in British ports. · In the case of The Alexander the libel was in rem against a Norwegian ship, for necessaries supplied to her in England in 1835, five years before the act went into operation. The jurisdiction of the court was contested on the ground that the act did not affect past claims; but the court held the contrary, and maintained the jurisdiction. In the course of the opinion (page 294), Dr. Lushington said: "Now the action in the case is brought in virtue of the particular statute recently enacted, and without that statute the court would not have been justified in entertaining the suit at all; for, although the subject-matter clearly falls within the original scope of the maritime law, before the passing of the statute, the court might have been prohibited from proceeding in the cause, on the ground that the common law had narrowed the general jurisdiction originally belonging to this court. Such prohibition is now taken off by the statute; but looking to the words of the act, I do not find any expressions limiting the jurisdiction of the court to cases accruing subsequent to the period when the act came into operation." The learned doctor treated the statute simply as an act of delivery of the admiralty from the thraldom in which it had been held by the common law courts; and he maintained the jurisdiction, not because the statute created a lien, or that the claim or cause of action had any foundation in it, but because the lien, claim, and cause of action clearly fell "within the original scope of the maritime law," and had their foundation in it. I consider the learned doctor's position entirely sound, and am not aware that its soundness has ever been questioned. In the case of The Wataga, the application was for payment out of the proceeds of an American ship for necessaries supplied to her in 1856, at the Cape of Good Hope, a British possession— the case being, in its incidents, almost identical with the one now under consideration. The

---

[2] [From 1 Am. Law T. Rep. 493.]

application was opposed on the ground that the statute of 3 & 4 Vict. c. 65, § 6, was not intended to apply to the case of necessaries supplied to a foreign ship in a port at a distance from England, though a British possession. But Dr. Lushington, by whom this case was also decided, held otherwise, and maintained the jurisdiction. The decision in that case would maintain the jurisdiction in this in that same court. At the close of the opinion (page 167), and after quite fully discussing the object and purposes of this act, he throws out the following significant intimation: "This claim must be maintained; but I am by no means clear, even if I am mistaken on the point of colonial ports, that it could not be supported under the narrower interpretation."

The high court of admiralty seems in fact never to have relinquished its claim, that under the general maritime law there was a lien for supplies, whether to domestic or foreign vessels, or whether within the body of a country or upon the high seas, only so that they were necessary and were furnished upon the credit of the ship. It simply surrendered to the superior jurisdiction and powers of the common law courts, and ceased to exercise the jurisdiction to enforce the lien. When parliament in part took off the prohibition imposed by the common law courts, by the statute of 3 & 4 Vict., the high court of admiralty to that extent simply resumed that which it had all along claimed as its right, and proceeded at once to enforce a lien which it assumed, and no doubt rightfully, had simply been in abeyance. That the lien for necessaries supplied to a ship, recognized by the general maritime law, always existed in England as to foreign ships, before as well as after the act of 3 & 4 Vict., was assumed by our courts from the earliest period of the exercise of admiralty jurisdiction here, for while adopting in the main, the admiralty jurisprudence of England as there exercised, the supreme court of the United States from the beginning assumed and fully recognized the existence of the maritime lien for necessaries supplied to a foreign ship in all cases, and the jurisdiction of the federal admiralty courts to enforce it. See General Admiralty Rule 12. This rule, from the beginning, and all through its various modifications by amendments or otherwise, has always assumed the existence of the lien, and provided for its enforcement. This has always been true of it as to foreign ships, and recently it has been so amended as to drop all distinction in that regard. Maritime liens for necessaries supplied in England to a foreign ship, I am satisfied, have always had an existence there. Jurisdiction to enforce them was alone prohibited. It is well settled, however, that want of jurisdiction to enforce a lien in any particular locality is not fatal to the existence of the lien itself. The lien exists by virtue of the maritime law, and it follows the ship

wherever she goes, and may be enforced wherever there is a jurisdiction to enforce it. The Maggie Hammond, 9 Wall. [76 U. S.] 435, 451; The Avon [Case No. 680]. And this applies as well to the objection that there is no jurisdiction to enforce a maritime lien in the province of Ontario, where the cause of action arose. The question of lien in this case, therefore, in the absence of any positive enactment to the contrary, must be determined by the general maritime law, and by that law there was a lien, and also jurisdiction in this court to enforce it. No object on was made that the necessaries in question were not supplied upon the high seas, or upon tide water, as those terms are understood in English admiralty jurisprudence, and that therefore there could be no lien; it is therefore unnecessary to consider it. The omission of learned counsel to make that objection was undoubtedly for the very good reason that since the decision of the United States supreme court in the case of The Eagle, 8 Wall. [75 U. S.] 15, and of the United States circuit court for the northern district of Ohio, by Emmons, circuit judge, in the case of The Avon [supra], that objection has no longer any force in our court. This may be said to be especially so under the authority of the supreme court in the case of The Eagle, supra, in a case like the present, arising upon the great boundary waters between this country and British North America, constituting as they do great national thoroughfares, international in their character, and common to the vessels of both countries. There are many decisions of the admiralty courts of the United States which have a bearing upon the questions presented by the defense here under consideration; but it would serve no useful purpose to enter into an analysis of them here. A few of the leading ones, as far as I have taken the time to examine them, are, however, here cited: The Eagle, 8 Wall. [75 U. S.] 15; The Maggie Hammond, 9 Wall. [76 U. S.] 435, 451; The Avon [supra]; The Rebecca [Case No. 11,619]; The Phebe [Id. 11,064]; Dupont de Nemours v. Vance, 19 How. [60 U. S.] 171; The Boston [Case No. 1,669]; The Siren, 7 Wall. [74 U. S.] 156, 158; The Jerusalem [Case No. 7,394]; The Chusan [Id. 2,717]; Pope v. Nickerson [Id. 11,274]. See, also, Abb. Shipp. 142–150; 2 Kent, Comm. (8th Ed.) 281; 2 Pars. Shipp. & Adm. 322; Story, Confl. Law, § 286c.

The second proposition of the argument in support of the first ground of defense, viz., that there was no lien, and therefore no right of action in rem in this case, is not sustained; and with that the whole superstructure of the argument in support of that defense falls.

2d. The lien and jurisdiction to enforce it being maintained in favor of the original creditor, was the lien divested by the assignment of the claim? Upon authority, I am clear that this question must be answered

in the affirmative. It has been so held in every case in the federal admiralty courts to which my attention has been called, in which the discussion was not evidently influenced by special circumstances. In the case of The Patchin [Case No. 10,794], Judge Conklin, in a well-reasoned opinion, so held in regard to mariners' wages. He notices a distinction between liens for wages and upon bottomry bonds and bills of lading, which are assignable, on the grounds that the bond is an express hypothecation, and binds the ship to the lender and his assigns; and that the bill of lading is negotiable, made so by law for the benefit of trade, and its transfer carries with it the title to the goods shipped, and of course the right to maintain a suit upon it in case of their loss; while, on the contrary, the right of the mariner to proceed against the ship in specie, is conferred upon him for his own exclusive benefit, and arises by implication merely. He held that liens of the latter character are strictly personal. He recognizes that the claim or debt may be lawfully transferred, but holds that the lien does not follow. In the case of Reppert v. Robinson [Id. 11,703], the libel was in personam for repairs and supplies. In delivering his opinion, Chief Justice Taney said: "But if it appeared upon the proceedings that when the suit was brought Hamilton held this due bill as assignee, and the proceedings were instituted for his benefit, I do not think the admiralty jurisdiction could have been maintained; the right to sue in admiralty upon claims of this description is personal, and is maintained upon principles and for reasons which do not apply to the assignee." Certainly if no jurisdiction in personam, there can be none in rem. In the case of Sturtevant v. The George Nicholaus [Id. 13,578], the libel was in rem for salvage, and Judge McCaleb held that the same rule applies to liens for salvage as to those for wages, and that they are not assignable, citing, with approbation, Judge Conkling's opinion in The Patchin, supra. In the cases of Logan v. The Aeolian [Id. 8,465], and Rusk v. The Freestone [Id. 12,-143], the libels were in rem for wages, and Judge Leavitt held the same as Judge Conkling in The Patchin and Judge McCaleb in The Freestone. These are all the cases in the federal admiralty courts in which this doctrine has been maintained, to which my attention has been called, or that have fallen under my notice. There are, however, several cases in state courts, arising mostly under state statutes, conferring liens where none existed by the maritime law, and in favor of mechanics and others, in which the same doctrine has been held. Pearsons v. Tincker, 36 Me. 384, 386; Hays v. The Columbus, 23 Mo. 233; Lovett v. Brown, 40 N. H. 511; The White v. Levy, 5 Eng. (Ark.) 411.

The cases in the federal admiralty courts which seem to hold the opposite doctrine

will now be considered. In the case of The Boston [Case No. 1,669], the libel was in rem for repairs, and Judge Betts held that an assignee of the debt for a full consideration, who became such at the express instance of the master, was entitled to all the legal remedies possessed by the original creditors, including the right to proceed against the vessel. There can be no doubt that the fact that the transfer was made at the express instance of the master, had its influence, although it is not so stated in the opinion. At all events, it affords a reasonable explanation for the difference of opinion between the learned judge and the others whose opinions have been cited. In the case of The General Jackson [Id. 5,314], the libel was in rem for supplies, and Judge Sprague held that "the assignment of the claim, as security for a debt which has since been paid, would not of itself be a waiver of the lien." What his opinion would have been [if the debt had not been paid, or] [3] if the assignment had been absolute instead of for security merely, the case does not inform us. These are all the cases in the federal admiralty courts to which my attention has been called, or which have fallen under my notice, which even seem to hold that the lien is not divested by the assignment of the debt; and as to each of these cases it is to be observed that the decision was evidently influenced by special considerations.

As on the other side of the question, so here there are also several state decisions, based in like manner on state statutes, holding the same way as the judgments last cited. Hoyt v. Thompson, 5 N. Y. 320, 327; Sears v. Conover, 34 Barb. 330; Sorley v. Brewer, 1 Daly, 79; Iaege v. Bossieux, 15 Grat. 83, 88; Goff v. Papin, 32 Mo. 180; Tuttle v. Howe, 14 Minn. 145 [Gil. 113]. It is seen, therefore, that the decisions of our own admiralty courts upon this question are substantially all one way; and they fully sustain the position that the lien which a material-man has is strictly personal to himself, and does not pass to his assignee; that it is, in fact, extinguished by the assignment of his claim, so that neither he nor his assignee can come into a court of admiralty for its enforcement. I have not the time to devote to a discussion of the soundness of those decisions. It has, however, been so fully done by the learned judges in the opinions I have cited that there really does not appear to be much left to be said upon the subject. Even if I doubted the soundness of those decisions, I should hesitate long before venturing an opinion in opposition to so formidable an array of experience, learning and ability. At all events, I should not do so except for cogent and conclusive reasons. Until overruled by higher authority, the rule of those cases will be the rule of decision in this court. In England the ques-

[3] [From 7 Chi. Leg. News, 1.]

tion does not seem to have been much discussed as applied to maritime liens; at all events not sufficiently to have established a rule upon the subject. See Cross, Liens, 48 (18 Law Lib.), as to assignments of liens in general, and The Wasp, L. R. 1 Adm. & Ecc. 367, as to assignments of maritime liens.

The proofs in this case showed that before this suit was brought, libellant had sold and transferred his claim to Johnson & Co., and that the suit was instituted by them, in libellant's name, but for their benefit. The lien was thereby lost, and the suit cannot be maintained. In this view of the case a consideration and decision of respondents' third ground of defense has become unnecessary. Libel dismissed.

[NOTE. The question of the assignability of maritime liens is examined at length by Judge Lowell in the case of The Sarah J. Weed, Case No. 12,350, and upon principle and authority he dissents from the doctrine of the principal case, and those upon which it is based, and maintains that such liens are assignable. In that case, too, the lien was one for supplies. Prior to that time an assignment of a lien for advances had been sustained by Judge Betts, in The Panama, Id. 10,703. The Sarah J. Weed was followed in the case of The American Eagle, 19 Fed. 879, which involved a lien for supplies, and in The M. Vandercook, 24 Fed. 472, which was a case of lien for salvage. See, also, to the same effect, The Norfolk, Case No. 10,297; Murdock v. The Emma Graham, Id. 9,940; and The Liberty No. 4, 7 Fed. 226, in which, however, in addition to the assignment, there was held to be a right of subrogation. In the case of The Woodland, 104 U. S. 180, the supreme court seems to assume that parties who discount a draft given by the master or owners in payment for repairs, etc., furnished to his vessel in distress, would be entitled to enforce the same against the vessel; but the court decided as a matter of fact that the drawee had been reimbursed by sales of cargo, that the drafts were fraudulent, and that consequently no lien had ever existed. Upon this subject the court says: "It is incumbent on the libellants to prove a debt from the vessel to Niles [the drawee], and its amount. Until this proof is made they cannot recover. If the settlement between the master and Niles had not been impeached, that would have been enough, for the master is the agent of the owner for all purposes. But it has been impeached," etc. In The Pride of America, 19 Fed. 607, it was held that where a maritime lien attaches to a vessel, and her owner gives a draft for the debt, the draft in terms recognizing, confirming, and continuing the lien, an assignee of the draft and claim can enforce the lien against the vessel; citing, as authority, The Woodland, supra.]