Henry E. Howland
Referee.—The fact that Mas tin, the cashier, made the agreement testified to by the defendant is not disputed. This was, in effect, that it they would accept the drafts the bank would keep a balance with them large enough to protect them, on which they should have a lien, and in case the bank got into trouble they should be notified and be at liberty to charge up the acceptances against the balance in their hands.
The plaintiff’s counsel have argued with great earnestness that in making such an agreement the cashier exceeded his powers, and that such an agreement is in violation of the provisions of the Revised *52 Statutes, prohibiting any transfer by any incorporated company in contemplation of insolvency (1 R. S. 608, § 4).
At the time this agreement was made, the bank was not supposed to be insolvent—the claims upon it had all been paid as they were presented, and its officers were making efforts to keep its credit unimpaired, and to meet all future calls upon it. The property pledged by the cashier consisted in part of the very funds realized from the defendants’ acceptances under the agreement. The agreement was not a transfer in contemplation of insolvencj?-, but was rather an agreement to raise money to prevent insolvency.
If the cashier had power to borrow the money,' I am at a loss to see how the bank or its representatives can object to his making a valid agreement to repay it or to secure its repayment. The assignee stands in no better position than the bank in that respect (Griffin v. Marquant, 17 N. Y. 28; Schieffelin v. Hawkins, 14 Abb. Pr. 116 ; Green v. Warwick, 64 N. Y. 220 ; Crane v. Turner, 67 Id. 437; Cutts v. Guild, 57 Id. 232.
If the cashier came clothed with authority to raise money, and the bank accepted the money, they cannot have the benefit of it and repudiate the other part of the contract, as to the mode of its payment, if the contract is not forbidden by law (31 N. Y. 611; 32 Id. 105 ; 19 Id. 156).
A cashier must act within his authority, but when his bank receives and uses money borrowed by him in pursuance of an agreement, they- imply that he had authority to make the agreement, and must abide by it, unless its provisions are repugnant to law.
There is no doubt that an officer of a moneyed corporation cannot transfer property of the corporation in contemplation of insolvency; but this is not that case. A part of the funds of the bank were raised by virtue of the very agreement which plaintiff’s counsel *53 claim was a fraudulent transfer. Shall the plaintiff s assignee have the benefit of funds so .raised, and repudiate the rest of the transaction % The law cannot surely sanction such a proceeding. The bank and its assignee are estopped from setting up such a defense.
The fact that the lien was upon a shifting balance does not render it invalid.
By agreement, a lien may be given on any property not in existence or owned by a person at the time of the agreement, but to take effect when the property is obtained or came into existence (Hale v. Omaha Nat’l Bank, 49 N. Y. 626; McCafferty v. Woodin, 65 Id. 459, reversing S. C., 62 Barb. 316, cited by plaintiff’s counsel; Wisner v. Ocumpaugh, 71 N. Y. 113).
The defendants did not, by entering into this agreement, become parties to a fraudulent transaction. They held out no representations to the holder of drafts drawn against any funds in their hands. They owed them no duty until they accepted drafts. The holders of the drafts purchased solely on the credit of the Mastín Bank, not on any representations of the defendants that the bank had funds in their hands. They had signed the acceptances only on condition that the bank would give them just that security, and it would have been fraud on the part of the bank if it had not done so.
It is urged, on the part of the plaintiffs, with much earnestness, that the defendants cannot invoke the principle of equitable set-off in this case, because, as it is asserted, their obligation or debt had not matured at the time of the assignment to the plaintiff, whereas the debt was due from the defendant to plaintiff’s assignor.
The cases have made this distinction, that where there are cross-demands between a solvent and an insolvent person, the party who is solvent can, in equity, set off his debts agaiiast the others, if his cross *54 demand against the insolvent is due, notwithstanding the claim against the insolvent debtor is not due, for the reason that he has a right to waive a credit which is solely for the benefit of the other party ; but if the cross-demand against the insolvent is not dne, no set-off will be ordered in equity, because the insolvent is entitled to the full period of credit, and until he is bound to pay the debt a debt due him cannot be set off against it. Whatever may be the effect of his insolvency, the court cannot change the contract of the parties.
And the cases cited where this doctrine is laid down are mainly cases where the principle has been invoked before both debts became due, in order to prevent the insolvent from parting with the evidence of debt of the solvent debtor.
It will be seen in all those cases that it is not because the court has not the right of equitable power to do it, but because the peculiar facts of each case show that it would be contrary to equity to do so. In a case where the debt from the solvent party is due, and the debt from the insolvent party is not due, something more than the mere insolvency of the one party is required. In the language of Judge Hogeboom, (36 Barb. 230), " There must, in such a case, be some special circumstances—an agreement between the parties, expressed or implied, or a course of dealing between the parties—leading clearly to the inference that such was their intention or expectation, or some other controlling equities, to justify such a course.”
Latterly, the courts do not require so much. Within the spirit and the letter of the later decisions in the court of appeals, no distinction is made between the cases where the debt from the insolvent is not due, and the cases where the debt from the solvent party is not due. It is sufficient that justice and equity require the set-off. • In the language of Judge Allen, in Smith v. *55 Felton (43 N. Y. 423): “ It is enough, that justice and equity demand that the debts should be set off against each other, rather than that the defendants should be made to pay the note and left to rely upon the estate of an insolvent debtor for the payment of the debt due them” (see also 74 N. Y. 473, 474 ; 59 Id. 537, 538).
In all of the cases presenting this question, where the set-off has been denied, the court in each case has simply passed upon the case before it, as presented by the facts and pleadings in that case, and so left it.
In Seaman v. Van Rensselaer (10 Barb. 83) Judge Hand says: “ In a case of natural equity the court will allow an equitable set-off when justice cannot otherwise be obtained,” citing many authorities ; and then adds : “ The case of Bradley v. Angel (3 N. Y. 475) is not opposed to this rule, but rests upon a special contract.”
'The case of Myers v. Davis (22 N. 7. 489), was a claim for articles manufactured for the insolvent after he had made his assignment, and was, therefore, a debt, which neither in law nor in equity could be set off.
In the case of Martin v. Kunzmuller (37 N. Y. 396), no equitable defense was set up or relied on. The action was brought by an assignee, and the defendant attempted to set off a note against the assignor, which was not due when the assignment was made, relying on the statute. The court charged the jury that it “ was not a legal off-setP To that the defendants excepted, and as the court said on appeal, was, “ the only question presented ” (page 396), and at page 397 says that “the case depends entirely upon the statute.'” - -
Leaving out of view the fact that under the agreement the defendants had a right to charge up their claim, which was fixed and liquidated, whenever they should be notified by the bank, and the deposits in their hands were not payable until they were demanded, it *56 is enough to say that at the time this action was brought both debts were due, and that unless the assignment by the bank to the plaintiff changed the positions of the parties, the defendants can, in equity, set off their claim against that of the bank.
Holmes & Adams, attorneys, and Leslie W. Russell, of counsel, for appellant, urged:
I. The agreement was void under the laws of Missouri (Myers' supplement to Wagners Missouri Statutes, p. 394, c. 122, § 21; 1 Wagner Stat. [ed. of 1870], p. 280, § 2 ; O’Shea v. Collier W. L. Co., 42 Mo. 397). II. A promise is to be interpreted in that sense and with that reservation which the parties understood at the time of making it (Barlow v. Scott, 24 N. Y. 40). We assume that the defendants did not intend to agree with Mastín to do that- which was contra bonos mores, *57 or against public policy. That the parties did not intend the agreement as one which must be observed, according to their present claim, is evident from the fact, that the deposits were nearly all the time below the amount of the acceptances, after June 11, 1878—at one time running as low as $17,000; and from the further fact that daily drafts were drawn and paid, to the amount of $41,992.09, only those remaining unpaid which were not presented before August 3, 1878. Therefore the legal effect of the oral negotiation, called an agreement by the referee, being limited by well-defined rules of law, renders nugatory any apparent understanding, which was hostile to the purpose of the depositor, both because hostile to that purpose and because against public policy (4 Kent Comm. 468; 2 Parsons on Contr. 513). III. But, if it can be held that legally a fund can be created for the purposes indicated, and still be destroyed by reservations unknown to the world dealing commercially with the parties, then we submit that the agreement is void for other reasons of public policy. Is it possible that a banking corporation, within the rules which usually govern banking business, can pledge in advance funds which are not in the bank or in the control of the bank at the time of the pledge, and by the mere operation of such an agreement shift the lien from day to day, cause it to vault from the funds of one day to the new deposits of the next, and transfer it by force of a simple promise from funds in esse to those non-existent at the time of the alleged agreement, especially to the prejudice of parties buying drafts against those very balances ? ' If this supposed rule of shifting liens exists, it is an anomaly in the law-merchant. The ordinary rule of law is that the creation of a lien requires a subject in esse in the power of the grantor at the time the lien is created (Edgell v. Hart, 9 N. Y. 217; Bank v. Hunt, 11 Wall. *58 391; Mittnacht v. Kelley, 3 Abb. App. Dec. 301; In re Aldrich, 6 Ben. 483 ; Powers v. Freeman, 2 Lans. 127; Otis v. Sill, 8 Barb. 102). The learned referee, however, apparently nullifies the effect of these authorities by the later cases, cited by him, of Hale v. Omaha Bk., 49 N. Y. 646 ; McCaffrey v. Woodin, 65 Id. 449 ; and Wisner v. Ocumpaugh, 71 Id. 113. A scrutiny of these cases shows that they are not antagonistic to those cited. IV. The cashier had no power to make the agreement in question, and his act was not binding upon the bank, nor certainly upon.the assignee. Ho greater irresponsible power could be placed in the hands of a cashier, and the agreement was void (Hoyt v. Tompson, 5 N. Y. 320; Bank of United States v. Dunn, 6 Pet. 55; 1 Daniel Neg. Inst. 322; Elliott v. Abbott, 12 N. H. 549 ; Divies Co. Asso. v. Saylor, 63 Mo. 24 ; 1 R. S. 591, § 8). The learned referee states three objections to this argument': First. That the agreement was designed to raise money to prevent insolvency instead of being in contemplation of insolvency. How that could be when no increase of property is obtained, is not perceivable, and the same statement might apply to every effort of a failing corporation to struggle on, when it ought to be summarily wound up ; but were it so, the point is entirely evaded that the law does not 'tolerate the clothing of the cashier with such a tremendous authority, and does not intrust to him the power to terminate the life of the bank at his own will. Second. The learned referee further says, that if the cashier, had the power to borrow the money, he is at a loss to see how the bank or its representatives can object to his making a valid agreement to repay it, or to secure its repayment. He has undoubtedly the right to make the ordinary agreement for repayment tolerated by commercial usage and public policy ; but this is a widely different thing *59 from the power to borrow any sum of money that he chooses and to place upon the assets of the bank a lien, open or secret, which is entirely inconsistent with commercial usage and utterly alien to the purposes and existence of the bank. And even if he had the power of pledge of the very funds which he raised upon the plea of some equity of the defendants, as they contributed to the raising of those funds, he could not continue the lien indefinitely upon future sums which might be remitted by the bank in due course of business to be drawn against. Third. The learned referee further says, that the bank and assignee are estopped from setting up such a defense. If this be so, it is the first time in the books that a case has arisen where parties negotiating an illegal contract, and presumed to know its illegality, are estopped from setting up that illegality because the other side had carried it out by the mere payment of money. Nearly all of the cases which pass upon the powers of cashiers or other agents of corporations are those in which parties have parted with their money to the corporation upon the assumed faith of the validity of the agreement, but it is held to be their duty to know whether the agreement is legal or illegal, and if illegal, that it cannot be enforced (Delafield v. State, 26 Wend. 192, 221; Pratt v. Eaton, 79 N. Y. 419 ; reversing S. C., 25 Hun, 295 ; Crocker v. Whitney, 71 N. Y. 161 ; Bank of Salina v. Alvord, 31 Id. 473). The learned referee also observes in various places in his opinion that the assignee stands in no better position than the bank, and that he simply represents the bank. Our argument is founded upon the assumption that the bank itself could have repudiated the power of the cashier to make such a contract, and could have maintained the position, had the action been brought by it before insolvency, that the pledge was invalid and against public policy. But upon the equitable branch *60 of the case and where the position of either party must rest upon equitable considerations, it becomes evident that the assignee, being the trustee of the creditors, and, as expressly found, of the holders of sight drafts to the amount of more than the balance in the hands of the defendants, occupies a more favorable position than the bank itself, and can disaffirm acts which it could not (Southard v. Benner, 72 N. Y. 424, 427; Laws 1858, c. 814 ; Grillet v. Phillips, ubi supra). That the laws of New York -govern the transaction, except so far as, by comity, the courts will recognize the law and decisions of Missouri, is evident, it being a question of public policy (Edgerly v. Bush, 81 N. Y. 199 ; Faulkner v. Hart, 82 Id. 413; Southern Life Ins. Co. v. Packer, 17 Id. 51, 53 ; Curtiss v. Leavitt, 15 Id. 9). Therefore, the statutes of this State upon questions of public policy, especially where the plaintiff represents the interests of a large number of creditors residing in this State, govern the transaction, if inconsistent with the laws of Missouri. The letter of Mas tin, and the telegram of August 2, did not confer upon the defendants the power to appropriate the general balance on deposit with them to the credit of the Mastín Bank to the payment of bills of exchange not due and not owned by them. 1. The cashier had no more power to make any such arrangement then than he had in June, 1878. 2. By the statutory laws of this State and of Missouri, preferences are not to be given to the creditors of moneyed corpora- ; ions, the design being that its funds, in case of insolvency, shall be equally distributed among its creditors (1 R. S. 591, § 9 ; 6 ed. vol. 2, p. 298). This statute, as it affects'public policy, is alike applicable to domestic and foreign corporations. This was so held in regard tó the defense of usury (Southern Life Ins. Co. v. Packer, supra). Such a transfer or payment is utterly void (Huxton v. Bishop, 3 Wend. 13 ; Robinson v. *61 Bank of Attica, 21 N. Y. 406 ; Furniss v. Sherwood, 3 Sandf. 521, 523; Horcy v. Kerr, 8 Bosw. 194). VII. The doctrine of set-off cannot be invoked as a defense or counter-claim. If the defendants had held, on the 4th day of August, 1878, the acceptances themselves, under the ■ ordinary rules pertaining to set-off, these acceptances would not be a defense as against the suit by the bank itself (2 R. S. [Edm. ed.] § 18, et seq.; Code Civ. Pro. § 502; Beckwith v. Union Bank, 9 N. Y. 211; Referee’s opinion, fol. 351, et seq.). VIII. But the defendants claim that certain equitable principles may be successfully invoked in this case to avoid the rule of law in regard to a set-off, and give the defendants exemption from the payment of the money, upon the doctrine, purely, of equitable set-off as settled by the courts. It will be observed at the threshold of the argument, that reserved rights or liens limiting the free disposition of. balances of. accounts with a banker are not favored by the courts (Grant v. Taylor, 35 Super. Ct. 338). And it is evident that the legal rule of set-off cannot be modified to admit of the interposition of an unmatured indebtedness on behalf of the alleged debtor, unless equity demands that it shall be done (Lindsley v. Jackson, 2 Paige, 580 ; Barber v. Spencer, 11 Id. 517 ; Smith v. Felton, 43 N. Y. 419 ; Bradley v. Angel, Id. 475; Meyers v. Davis, 22 Id. 489 ; Martin v. Kuntzmuller, 37 Id. 397; Chance v. Isaacs, 5 Paige, 592; Union Bank v. Beckwith, 9 N. Y. 211; Keep v. Lord, 2 Duer, 78). In all cases, to jus-' tify its interposition, there must be, in addition to insolvency, the existence of a personal demand against the debtor, held by the creditor at the time the creditor acquired his rights to the claim of the debtor which he seeks to enforce. It must also be equitable to interpose the defense. In the case at bar, the defendants held no demand against the Mastín Bank at the time of the assignment. They simply stood in the light *62 of acceptors of drafts. The case is further distinguishable from those cases in which equitable set-off has been allowed, by the fact that there is no principle of equity whatever that demands the allowance of a defense. The defendants had for many years done a very large business with the Mastín Bank, and, presumably, a beneficial and profitable one, and this arrangement was designed to continue the business. Under such circumstances, the drafts were not accommodation drafts (2 Gfreenl. Ev. § 172; Chilly on Bills, 319, 328 ; Bagnall v. Andrews, 7 Bing. 217; Farmers’ Bank v. Rathbone, 26 Vt. 19). The learned referee rules equitably that a set-off exists, and that the equitable rights of the draft-holders may not be enforced, because legally the plaintiff only represents the bank and not them (see Westlake v. Bostwick, 15 Super. Ct. 261; Jordan v. Nat. Shoe and Leather Bk., 74 N. Y. 467). IX Even if the referee is right in his legal conclusions, the plaintiff was entitled to a judgment for the balance, which is $4,323.98, with interest. Because a less sum than the balance which we claim to be due was demanded in the complaint, the referee erroneously supposes that we cannot have judgment for the sum which is really our due, to wit, the above balance, and that it is necessary to have an amendment of the pleadings to accomplish that end. This is incorrect. We might have been contented with the sum demanded by the pleadings, irrespective of the error of a few hundred dollars, in case of a recovery; but, in case of defeat upon the main proposition, we are entitled to as much less than the sum demanded as the proof shows we are entitled to claim. It needs no amendment for this purpose; and if it be urged that the allegations in the complaint that “since the beginning of the action the defendants have paid to the plaintiff the sum of $5,111.81, a part and on ac *63 count of said indebtedness of $50,076.38, over and above the sum of $10,023.29, now in court,” which is not denied by the answer, in any way affects the question, then we can urge with the same propriety of reasoning that we have a distinct admission of the payment of this sum as a part of the larger sum which we claim, and are entitled to draw therefrom the conclusions which the admission warrants. But, if any amendment were necessary, it is merely a formal one, as the precise evidence of what the balance was, was derived from the defendants’ own books and testimony ; and the refusal to conform the pleadings to the proof in such a respect, preventing thus a small judgment for the plaintiff and giving a judgment to the defendants, would be a ruling which the courts would review and correct.
*56 But a general assignee for the benefit of creditors succeeds merely to the right of the assignor. He is not, in respect to the property transferred, a bona fide holder for value, but takes it simply as a trustee, subject to any equities which may exist between the debtor and his creditors. He stands in precisely the same condition that his assignor did, and if the debt could have been equitably set off against the bank, it can against him.
Such was the language of the court in the case of Scheiffelin v. Hawkins (14 Abb. Pr. 114), where that very question arose, and the reasoning seems to be sound (see also Smith v. Felton, 48 N. Y. 423).
Upon both the grounds above indicated I think the defendants are entitled to judgment.
Judgment having been entered in favor of defendants against the plaintiff on.this decision, dismissing the complaint, and adjudging that defendants recover against plaintiff their costs, plaintiffs appealed to the general term.
Knevals & Ransom, attorneys, and Erastus S. Ransom, of counsel, for respondents, among other things, urged
I. As between the defendants and the Mastín Bank, the defendants, although acceptors, were in fact sureties, and were entitled to security (Bank of Toronto v. Hunter, 20 How. 292). It was the duty of the drawers to put the acceptors in funds (2 Denio, 211, 212), and the drawers may at any time direct the application of the funds in the drawee’s hands to the discharge of the obligation (2 Denio, 216). And charging up a check or draft against the drawer is an application of the deposit.- It is the same as drawing out the money and then handing it over or back again (Pratt v. Foote, 9 N. Y. 463; S. C., 10 Id. 600, 601). II. It cannot be said that the bank had no right or power to make such an arrangement. By agreement, a person for whom another assumes a liability or a contingent liability may pledge property he then has or may thereafter have, to the payment, or as security for the payment, of that liability, or authorize such property to be appropriated by the surety before he *64 pays the debt-. A confession of judgment to secure a contingent liability is a case of that kind. Such a judgment is not only a lien on property, but the party to whom it- is given may enforce and collect it by execution before he pays it. So a mortgage may be given upon property to secure an indorser or other person contingently liable. A lien that a party would not otherwise have, may be given by. express agreement (4 N. Y. 498, 501). By agreement a lien may be given on any property not in existence or owned by the party at the time, but to take effect when the property is obtained or comes into existence (Hale v. Omaha Nat. Bank, 49 N. Y. 626; McCaferty v. Wooden, 65 Id. 459; Wisner v. Ocumpaugh, 71 Id. 113). Besides, a banker has a lien on deposits for any debt due from the depositor (74 N. Y. 473); and, as above shown, any property may be pledged or mortgaged, or a lien given on it, to secure a debt not due or upon a contingent liability. The plaintiff in this case is not even a bona fide purchaser, but as an assignee in trust, he stands in no better situation than the bank would have stood if the assignment had not been made (Reed v. Sands, 37 Barb. 185; Bliss v. Cottle, 32 Id. 322; Griffin v. Marquardt, 17 N. Y. 28). Besides, any assignee would take such a claim (not being negotiable paper), subject to all equities (Green v. Warwick, 64 N. Y. 220 ; Cram v. Turner, 67 Id. 437; Cutts v. Guild, 57 Id. 232, 233 ; Blydenburgh v. Thayer, 34 How. Pr. 88; Ely v. McKnight, 30 Id. 97). And even if the transaction had been fraudulent, no one will pretend that the bank could have repudiated the transaction or prevented the set-off, if the defendants had not made the application at all (2 Parsons on Cont. 277, 278; Draper v. Trescott, 29 Barb. 404). If it shall be said that the act of 1858, chapter 314, gives an assignee in trust such right, it is a sufficient answer to that, that that act simply authorizes an assignee to file a bill to *65 annul and set aside a previous transaction in fraud of creditors, and then, with that fraudulent contract or conveyance annulled and removed by the judgment of the court, to recover the property (see McMahon v. Allen, 12 Abb. Pr. 277). That is not the case; this is an action at law to recover the debt without regard to that statute, and cannot be transformed into a suit in equity (Short v. Barry, 3 Lans. 147; Craig v. Hyde, 24 How. Pr.. 313; Towle v. Jones, 19 Abb. Pr. 449; 1 Robert. 87 ; Heyward v. City of Buffalo, 14 N. Y. 540; Mann v. Fairchild, 2 Keyes, 106; Bradley v. Aldrich, 40 N. Y. 504). But above and beyond all this is the fact that there was no fraud in the transaction. It is not fraud for a party to pay what he owes, or even to pay it in advance. It is not fraud for a debtor in any case to secure his creditor, particularly when he agreed to do it at the time of the contracting of the debt. The defendants signed the acceptances only on condition that the bank would give them just that security, and it would have been gross fraud on the part of the bank if it had not done so. III. If it shall be said that at the time the defendants charged up and appropriated the deposits, the bank did not owe them anything, the acceptances not being due_, there are these answers to that: 1. A contingent liability is a debt (18 Wend. 375, 383, 384, 385, 398; 8 Cow. 406, 424). 2. This was even more than a contingent liability. The defendants being acceptors were primarily liable without protest or notice (Suydam v. Westfall, 2 Denio, 206, 212, 216; Bank of Toronto v. Hunter, 20 How. Pr. 292). 3. As before shown, it is not always necessary for a person who is liable to pay money for another, to first pay that money before enforcing payment of the person liable over to him (see also Gilbert v. Wyman, 1 N. Y. 550 ; Brancroft v. Winspear, 44 Barb. 209; Rector of Trinity Church v. Higgins,. 48 N. Y. 532). If then the bank could have *66 been compelled to make the application or give the security, how much clearer the case is made by the fact that the bank did do it, and that before the assignment was made to the plaintiff it was done and ended. IY. It is not necessary to invoke the doctrine of equitable set-off, as the defense is established by proof of the agreement between the bank and the defendants, that at the time the defendants agreed to accept the drafts, and as an express condition of the acceptance, the defendants were to have a lien upon the deposits which should be made by the bank with the defendants, and the right to hold and apply them for that purpose, and that the defendants should at all times be kept secured in that way, and have timely notice of any embarrassments of the bank, so that, for the defendants’ protection, they might, in such case, take and charge against the bank the amount; and that such deposits were máde with the defendants, such notice of the bank’s embarrassment was given them, and, as further directed by the bank, the amount of the drafts or sum which the defendants had assumed and become liable to pay, was charged up, and the deposits taken and applied or appropriated for that purpose. All that was lawful, right and just, audit was a complete defense to this action. But even if the acceptances had not been charged against the bank, or if the deposits had not been appropriated or applied before the assignmen t was made, and independent of any agreement on the subject, the facts and circumstances of the case entitled the defendants to have their claim against the Mastín Bank, or rather, the sum paid by them as accommodation acceptors, allowed and applied as an equitable set-off to the extinguishment of the plaintiff’s claim (Smith v. Felton, 43 N. Y. 419 ; 37 Barb. 230 ; 74 N. Y. 437; 59 Id. 537 ; Seaman v. Van Ramson, 10 Barb. 83; Scheiffilin v. Hawkins, 14 Abb. Pr. 116). The cases of Bradly v. Angel, 3 N. Y. 475 ; Myer v. Davis, 25 Id. *67 487; Martin v. Kuntzmuller, 37 Id. 396; as applied to the facts in the court, are not in opposition. V. There is nothing in the laws of Missouri differing from the laws of New York affecting the question in dispute. But if the Missouri laws were different, and made such transactions as the defendants had with the Mastín Bank void, it would not affect this case, as the contract with the defendants was a New York contract, and the security given to the defendants was given in New York, and the New York law governs. The defendants made their contract in the State of New York. They accepted the drafts in the State of New York. The drafts were made payable in the State of New York. The security given to the defendants was given in the State of New York. According to the law, as well settled, the New York laws govern (Story Conf. Laws, §§ 242, 280 ; Dickinson v. Edwards, 77 N. Y. 573, 575, 576, 458; Jewell v. Wright, 30 Id. 259; Everitt v. Vendryes, 19 Id. 436; Bowen v. Newell, 13 Id. 290 ; Ruckle v. Eckhart, 3 Id. 132; Hyde v. Groodnow, Id. 266).
By the Court.—Freedman, J.
Upon a careful examination of the case none of the exceptions taken appear to constitute ground for reversal. The facts found are sustained by the evidence and they support the legal conclusions based thereon. Upon the merits that were litigated, the referee clearly adopted the correct view. There is only one subordinate question that requires notice. After the close of the case the plaintiff’s counsel discovered that according to certain testimony given at the trial the plaintiff might have asked in his complaint to recover $323.98, with interest, in addition to the sum demanded, and thereupon moved that the complaint be amended to conform to the proof. But as the attention of the defendants’ counsel was not called to the motion until the settlement of the findings after the decision, the referee held that the motion was *68 too late, and he therefore denied it, to which ruling plaintiff’s counsel duly excepted.
The plaintiff was not entitled to the $323.98 in dispute without making a demand therefor. The original complaint and the admissions of the answer and the proof do not tend to establish that there was any demand which included this amount, e. g., a demand for $50,086.38 ; and a refusal to pay that specific sum, does not, under the peculiar circumstances of this case, include by implication the demand for a balance of $323.98, and a refusal to pay that. If a general demand for whatever balance there was, had been made, a different case would be presented. The refusal to pay the sum specifically demanded was justified by the defendants on the ground that, by the charges rightfully made for their acceptances, according to the agreement between the parties, their indebtedness to that extent had become extinguished before the action was brought. That question constituted the issue in the case, and upon that issue the defendants succeeded. I think, therefore, that an amendment was necessary tó enable the plaintiff to recover judgment for the sum of $323.98. As it is admitted that that sum is due outside of the matters litigated, justice requires that the plaintiff should get it in some way; but as to get it he must amend, he should, not enjoy that amendment without a corresponding preservation of the rights of the defendants. The amendment should have been as of the beginning of the action, when the defendants would have had an opportunity to take issue upon this additional demand of $323.98, or to admit their indebtedness to that extent with the usual consequences. Under the most unfavorable circumstances the defendants would have had to pay costs up to the time of an offer for judgment. Whether now they should be required to pay such costs, is questionable, nor is it important to determine the question, for the costs that *69 the plaintiff in any event might have been made to pay as a condition for granting his application for leave to amend, would have off-set them.
As the case now stands I think the result should be that the plaintiff have judgment for that sum, but that the defendants have judgment for the costs of the action, and that plaintiff’s judgment be off-set against that of the defendants.
The ground of reversing the order denying the amendment, which ordinarily is, and in this case was, properly within the discretion of the referee, is that general justice will be promoted and future litigation prevented thereby. For if the complaint does need amendment, another action may be brought on the demand for $323.98.
The order denying the amendment should be reversed, and leave to amend be given upon conditions which embody the above suggestions, and in all other respects the judgment appealed from should be affirmed, with costs.
Order to be entered hereon to.be settled on notice.
Sedgwick, Ch. J., and Speir, J., concurred.
The following order was entered on the general term decision.
“Ordered and adjudged, that the plaintiff, upon stipulating to pay the costs of this action, have leave to amend his complaint by inserting a claim for $323.98, in addition to the sum demanded, and increasing his claim to that extent; and that if he give such stipulation on making' such amendment, the said sum of $323.98 be deducted from the defendant’s recovery for costs in this action, and that thereafter the judgment as so modified be and the same hereby is affirmed, with costs. Further ordered, that upon plaintiff’s failure to give such stipulation within ten days after serving a copy of this order, the judgment appealed from be and the same here is affirmed, with costs.”
*70 The costs in the judgment below were $2052.27. The plaintiff did not stipulate, and judgment was entered affirming the judgment below, with $85.36, costs of appeal, to the respondents.